# THE STATE v. CUMMINGS, Appellant.

**Division Two, June 20, 1905.**

1. **CONTINUANCE: Absent Witnesses: Requisites in Criminal Case.** An application, in a criminal case, for a continuance on the ground of absent witnesses should show the materiality of the evidence of such absent witnesses and that due diligence has been used to procure their attendance; it should substantially state the facts expected to be proved by such absent witnesses, and that the applicant believes such facts to be true; it should give their names, and state where they reside or may be found, and should indicate the probability of procuring their attendance; it should state that the applicant is unable to prove the facts by any other witness whose attendance can be as readily procured; and, finally, it should state that the witnesses are not absent by the consent, connivance or procurement of the applicant, and that the application is not made for vexation or delay, but to obtain substantial justice.

2. ———: ———: **Lack of Diligence.** Application for process for witnesses should be timely. And where defendant has waited until six days before the day on which the case is set for trial, to secure process for witnesses, and fails, in the application for a continuance on the ground of the absence of such witnesses, to comply with the statutory requirements, it can not be said that the trial court has abused its discretion in overruling the application.

3. **ATTORNEY AS WITNESS: Confidential Communications.** An attorney who represented defendant's husband on a charge of larceny made by her against him, was not incompetent to testify, in the prosecution of defendant for the murder of her husband, as to conversations between defendant and her husband, occurring in the attorney's office, since he in no way represented defendant, and the communications were not confidential.

4. **EVIDENCE: Non-Reversible Error.** It is not every immaterial and irrelevant matter injected into a trial that will constitute reversible error. It must be of such a character as would tend to endanger a fair and impartial trial.

5. ———: **Identity of Letter.** The court did not err in permitting a witness to answer questions intended to establish the identity of a letter shown the witness with a letter which was seen by him in possession of the deceased, and which was addressed to deceased by defendant.

6. ———: **Relations Between Defendant and. Deceased.** It was not error to admit in evidence the testimony of a newspaper reporter as to a conversation with deceased a short time before the homicide, which went to show the relations existing between the defendant and the deceased, and as to declarations of defendant in the nature of a threat to make deceased suffer for what had been published in the paper by the reporter.

7. ———: **No Objection.** Alleged errors in the admission of testimony can not be considered if the record discloses that no objection was made or exception taken at the time the testimony was admitted.

8. ———: ———: **Remarks of Attorney.** Where defendant permits testimony to be admitted without objection, he can not complain that an attorney in his argument made improper remarks based upon such testimony.

9. ———: **Diagram.** There was no error in admitting a diagram showing the condition of the room, in which the homicide occurred, as it was at the time of the homicide.

10. **NEW TRIAL: Affidavits Filed Out of Time.** Where affidavits for a new trial are not filed until two weeks after the time granted for filing them has expired, and, in addition, such affidavits do not comply with the statutory requirements, the motion for a new trial is properly overruled.

11. **MURDER: Second Degree: Sufficiency of Evidence.** The evidence in this case, which was a prosecution for murder in the second degree, is examined, and held sufficient to justify the verdict of guilty.

Appeal from St. Louis City Circuit Court.—*Hon. Walter B. Douglas*, Judge.

AFFIRMED.

*John I. Martin, C. E. L. Thomas* and *James H. Lay* for appellant.

(1) The trial court committed reversible error in refusing to grant defendant a continuance. State v. DeWitt, 152 Mo. 76; State v. Bowman, 161 Mo. 88; State v. Clark, 147 Mo. 20; State v. Kindred, 148 Mo. 270; State v. Maddox, 117 Mo. 667; State v. Anderson,

State v. Cummings.

96 Mo. 241; State v. Bryant, 93 Mo. 273; State v. Strattman, 100 Mo. 540; State v. Wilson, 85 Mo. 134; State v. Bradley, 90 Mo. 160; State v. Moore, 121 Mo. 514; State v. Hickman, 75 Mo. 416; State v. Warden, 94 Mo. 648. (2) Error was committed in allowing alleged photographs and diagrams of the room and the furniture therein, where the killing occurred, to be introduced in evidence. (3) The court erred in allowing attorney Krone to testify to confidential communications made to him by the defendant. The relation of attorney and client existed between Krone and defenddant according to Krone's testimony and the testimony of defendant. (4) The closing argument made by the assistant circuit attorney was prejudicial to defendant. State v. King, 64 Mo. 591; State v. Lee, 66 Mo. 165; State v. Young, 105 Mo. 634; State v. Fischer, 184 Mo. 460.

*Edward C. Crow*, Attorney-General, and *Sam B. Jeffries*, Assistant Attorney-General, for the State.

Objection is made to certain statements made by the prosecuting officer in his closing argument to the jury. An examination, however, of these statements given with the objections, show that no prejudice was worked or injustice was done the defendant on account thereof. In the first place, the evidence was introduced just as stated by the attorney to the jury; and secondly, no reason was given for the incompetency of the testimony at the time it was introduced

*Herbert S. Hadley*, Attorney-General, and *John Kennish*, Assistant Attorney-General, also for the State.

A motion for a continuance is addressed to the sound discretion of the court, and under the facts in this case, it cannot be said that there was an abuse of that discretion. State v. Simms, 68 Mo. 305; State v. Banks, 118 Mo. 117; State v. Riney, 137 Mo. 102.

FOX, J.—This prosecution is based upon an indictment filed in the circuit court of the city of St. Louis, Missouri, on the 21st day of May, 1903. The indictment charges this defendant, Minnie Cummings, with murder in the second degree; that of wilfully, premeditatedly and with malice aforethought, killing one Dennis Cummings, on the 18th day of April, 1903, in said city.

Upon arraignment the defendant entered a plea of not guilty, and was placed upon trial on the 9th day of July, 1903, before a jury duly empaneled. The facts developed upon the trial on the part of the State were substantially as follows:

The shooting occurred at 2814 Locust street, in the city of St. Louis, in the back room of the third story. The defendant and the deceased were husband and wife; that they were married in July, 1902, and lived together, boarding at first one place and then another, until about four weeks prior to the difficulty, during which time they had been seeing and visiting each other frequently. After the separation the deceased boarded on Channing avenue in said city; that about three weeks before the difficulty the deceased was arrested, charged by defendant with stealing her jewelry, and placed in jail and remained there about a week; that during his confinement an officer visited his room, having a written order from the deceased to search it; the defendant appeared shortly after his arrest, at his boarding-house, and inquired for her husband; the door to his room being locked, the landlady thought he had left and so informed the defendant; that defendant appeared one evening and was very angry with the landlady for deceiving her; that she again visited his boarding-house one Sunday, and being refused admission to the deceased's room, told the proprietress her troubles, that Cummings had treated her very badly, stolen her jewelry, and requested the landlady to try to bring about a reconciliation, and if neces-

sary send for her, but to try to get him to visit her at her place; the deceased at that time was out of jail and she promised the defendant that she would deliver her message to the deceased, which she did the next morning; that on one of the visits of the defendant to the room of her husband, she borrowed scissors and opened his trunk looking for her jewelry, and while in the room, seeing some ladies' wearing apparel, hair pins, etc., she said that another woman had been in his room; the landlady informed her that she had formerly occupied the room and that the hair pins were her property; on Friday week before the homicide, the defendant secured a room at 2814 Locust street; that during that week defendant told the landlady that her husband was going with another woman, saying that she had seen him with another woman and referring to him as Cummings or the Irishman; that on Sunday night before the homicide she left her room saying that she was going to the deceased's boarding-house and wait until he came in if it was five o'clock in the morning; that she visited the deceased at his room one night, arriving there between two and three o'clock in the morning, and the next morning had breakfast with him; that the deceased and defendant had a conversation at the breakfast table in which a woman's name was mentioned; the defendant spoke very kindly of her and then asked the deceased why he did not come and stay at home with her and do what was right, to which he replied, "I am not going there, you want to get the drop on me; you want to kill me; you want to take advantage of me;" that the defendant said, "no such thing," that she wanted him to behave and that she didn't want to harm him at all; that the deceased was drinking and insisted that she wanted to kill him; he mentioned her former husband and said, "You want to get the drop on me like you did Harris," and finally he said he would not go home with her and never would go; that he did not intend to go back; that he was

afraid to. In a few days and on the day of the killing, the deceased removed his trunk from his boarding-house at the request of the landlady, who said she did not want to be bothered with their troubles; the defendant appeared on Channing avenue at the boarding-house of the deceased about two o'clock in the afternoon and about a half hour after the deceased had removed his trunk and was seen talking to someone in front of the house; the deceased removed his trunk to his wife's room on Locust street, reaching there about five o'clock that afternoon. The defendant was seen about half past four that afternoon at her boarding-house and asked the landlady if her husband had been there, and then went up stairs, returning shortly, telling the landlady that he had been there and left a note; she handed the note to the lady and asked her to read it; the note read: "I will see you later." The defendant was seen again about six o'clock that afternoon; she went into the kitchen, closed the doors between the hall and dining-room and told the landlady that she had killed her husband; she stated that when she went up stairs he drew a knife on her and she shot him; the lady remarked that perhaps he was not dead, to which she replied, "Yes, he is dead, come up stairs and see him." The lady then asked her why she did it in her house, and she replied, "It was my life or his and I had to do it; I found a pawn ticket on him for my jewelry, pawned for $90;" and calling the lady by her name said, "Mrs. Duff, you are a woman like myself, stand by me." The defendant further stated that there was a blood stain on the carpet but that it would wash out, and added, "It came out of my carpet on Evans avenue."

Dr. Rule testified that he was called to the scene of the shooting and arrived there about six o'clock; that he found the deceased lying on his back with his head on a rug; that his feet were to the south window, with one limb entirely extended and the other slightly con-

tracted; that he found blood in the southeast corner of the room about four or five feet from where the deceased was lying, also blood on the curtain on the window and on the rug on which his head was lying; on the floor near the window he found a bullet; that there was an indenture in the wall showing where the bullet struck; that the deceased had on his overcoat, which was thrown back, but that it was about straightened out under him; that from his examination of the body the deceased had been dead a half hour or longer when he arrived; that the blood had changed in color and had congealed about the wound; that the defendant stated to him that she was expecting trouble and had bought a revolver; that he then left the house to notify the police and when they arrived he returned to the house and found a knife in the deceased's right hand under his body, with the large blade opened.

The testimony further shows that about three o'clock on the afternoon of the homicide the defendant visited the barber shop of W. T. Cambron on Leffingwell avenue and asked to borrow a revolver, saying that she had been robbed about two weeks before; the witness told her that he did not have one and she then asked if he knew where she could find one. About four o'clock that afternoon the defendant visited Dunn's Loan Company and borrowed a 38 calibre revolver, for which she paid $7, agreeing to return it in a week or ten days, on the returning of which she was to be refunded a certain sum.

Dr. Hochdoffer testified that he was connected with the coroner's office and that on the afternoon of the shooting he performed a post-mortem examination on the body of the deceased, and found two gun-shot wounds, one on the right side and the other on the left side of the face, just over the right temple and the left temple; that the one on the left side was a scalp wound and showed marks of powder burn; that the right eye was discolored; that the wound over the right temple

caused practically immediate death, as it penetrated the brain; that the muscular system relaxed and that the deceased must have fallen in a heap when he was shot.

Frank Nally testified that he was a police officer and that he visited the scene of the shooting, arriving there about 6:30; that he found the deceased's body on the floor; that he searched his pockets and among other things found a knife in one pocket in a case.

Assistant chief of detectives Kiely testified that on the evening of the homicide the defendant came into his office with an officer and that he remarked, "Well, what is the trouble?" to which she replied, "Well, me and my husband had trouble and I shot him;" she said he came there drunk and started to abuse her and he picked up a pair of scissors and threw them to the corner of the room and then partly turned around, and put his hand in his pocket and she supposed he was going to get his knife, and that she was standing near the foot of the bed and reached down and took up the revolver and shot him, and that he fell with the knife open in his hand.

Charles Krone testified that he was an attorney at law; that the defendant and the deceased came into his office; that he was then representing the deceased on a charge of stealing his wife's jewelry; that he was not at any time employed as an attorney for the defendant, that the defendant and deceased had a conversation in his office, after the dismissal of the charge against the deceased; that the defendant asked the deceased what he had been doing in the chief's office, to which her husband made no reply; the defendant then called her husband a dirty low down scoundrel and said he run after lewd women; she said, "You insulted my dear aunt," to which the deceased replied, "Your dear aunt nothing, not so; she was a prostitute; a party in jail told me and he knew her." The deceased said the defendant was no better and she called him a liar and a damn liar repeatedly; that the defendant then remarked, "To think

that you would take the jewelry that my former dear husband gave me, an honorable man, to think that you dirty low down scoundrel would steal my jewelry;" the witness then turned to the defendant and said, "You are alluding to your former husband, or to some other husband you may have had," to which the defendant replied, "I will give you to understand that I have had only one husband before Mr. Cummings;" that the deceased called his wife a bigamist and a liar, and the defendant called him a damn liar. The witness then said, "Well, you are alluding to Mr. Harris, the man found dead in his bed with a bullet through his head," to which she replied in the affirmative; that the deceased then remarked, "You killed him and you know you did, and you confessed to me you killed him;" the defendant then called him a liar and said, "You are my husband—you think you are a smart young fellow, you dirty low down scoundrel, I will teach you a lesson."

Archie T. Edmonston testified that he was a reporter for the St. Louis Star, located at the Four Courts; that he saw the defendant the day after she caused the arrest of her husband for stealing her jewelry; that she came to the press-room that morning and asked for a Star reporter, and asked the witness if he had written the article that appeared in the Star; he told her that he had and she demanded to know where he got it; the witness told her that he had gotten it from her husband, but that he could not publish all that the deceased had told him; that he told her that the deceased had told him that she had confessed to him that she had killed her first husband, Harris, had shot him; that the defendant said, "It is not true, he shot himself." That the defendant then said she would make him suffer for what he had said and for what had been published; the witness then told the defendant that he would publish her side of the story; that on the day the case against Cummings, charged with stealing his

wife's jewelry, was set for trial, he saw her in the sheriff's office with Cummings; that they were having words but he did not understand what was said; that they were both angry. The witness testified that he saw the defendant in the office of the chief detective the night of the shooting and heard a conversation between the defendant and the assistant chief detective; that she stated she came in that night and found Cummings in her room; that he had been drunk; that he started to talk to her; picked up a pair of scissors lying on the dresser, half way opened them, and then threw them to one side; then turned half way around and made a move towards his pocket as if to draw his knife which she knew he had; that she rushed to the foot of the bed where she said she had a revolver, grabbed it up and shot him; that she said the ball must have struck him in the side of the head, as he was scarcely half way turned; she said she knew he had a knife and knew he had no revolver, because he had pawned his revolver several days before that and that she knew he had no money to redeem it, because she had loaned him her meal ticket the morning or night before; that she had to kill him; it was a question of which should die; that she was afraid he was going to attack her with a knife and therefore shot him, and that she then rushed down stairs, ran out of the house and went to the Four Courts and surrendered.

The defendant introduced evidence showing that the deceased was of a wild and turbulent disposition and in the habit of becoming intoxicated, and when in that condition was very quarrelsome.

The defendant testified in her own behalf substantially as follows:

"On the 18th day of April, 1903, I lived at 2814 Locust street with Mrs. Duff; I lived in the back room of the third story; the deceased and I were married on the 13th of July, 1902; we first lived at 336 Lucas avenue and then went to 3400 Lucas avenue; stayed there

about four weeks; one night he came home about half past eleven, very drunk, and I did not know what was the matter with him; I got up and asked him what was the matter; he knocked me down and called me names and said I did not care for him. He pulled his trunk out in the hall and said he would not live with a woman that did not love him; I pulled the trunk back in the room. He had a revolver in his hand; he went down in front and shot his revolver; came in again and commenced to swear and beat me and threw me on the bed; I screamed for help; he said, 'I will kill you, I don't care who comes in;' he left the room and returned and beat me again and I begged him not to kill me; he said he would kill me anyway. I paid the board for both of us; paid the board all the time out of my own pocket. I was working at the dressmaking business and made $10 a week. We then moved to 2904 Morgan street; a lady came there to see him one night; we did not stay there very long because the landlady told me that she couldn't have us around the house. We then moved to 2934 Lucas avenue. I was out for a week; when I came back he accused me of being out with men. He knocked me down on the floor near the table, pulled a revolver from his pocket and was going to smash me with it; I got scared, heard someone in the hall and pushed his revolver under the wardrobe; he then struck me and called me names; another time he came home drunk, broke the door open and struck me. I ran downstairs and asked Mrs. Harris if I couldn't stay with her all night, that I was afraid he would kill me, I stayed that night with Mrs. Harris in the back parlor and he kept going up and down stairs every five minutes, saying, 'If I could get her I would kill her, the God damn bitch; she will not run away from me.' Then I went upstairs in the room the next morning and he was there and commenced quarreling with me; accused me of being out all night; I had not been out that night nor the night before. After that I was working at Nugent's

and he came down there right in at the door at the Washington avenue entrance and came up to me and says, 'I have got to have some money. I will have money or there will be trouble; you know what Callaway did to his wife across the street here; if you don't get me some money I will do the same thing,' and so I gave him $10. The next trouble we had was on Washington avenue. He got in my room that night with a skeleton key and took $29 and all of my jewelry out of my trunk. I was going up-stairs and I met him running down and I went upstairs and wondered how he got into the house, and asked the landlady. I followed him to Washington and Garrison, screaming at the top of my voice and caught up with him. I told him to give back my money; he said he wouldn't do it. I went back home. I went down the next morning to the insane asylum to see him; had a talk with him; said he had my jewelry and money, but would not give it to me. I then went back near the asylum and saw Mrs. Leissmeister and asked her if I could get board there; I did not get board at first, but went back the second time and she took me in; got a room and board. My husband lived there with me. I went there Saturday and he came on the following Monday. I got the jewelry back in three weeks, but never got any money back; I had trouble with him at that place. One night he came home very drunk and commenced to quarrel and pointed his revolver at me; said he would kill me. I ran up to the third story and the landlord got up and told him he must put away that revolver. He then went back to 2914 Locust street. I did not see him until the following Monday. He stole my jewelry again and $30 in money. I wrote him on the 11th of April; I did not write him a letter on Saturday, April the 18th. Friday, April 17th, we got up late and had breakfast at 3100 Olive street. I paid for the breakfast; I walked to Thirty-fourth and Channing and got his laundry; paid one dollar and a half for it; I brought it back to his room on Channing

avenue; saw my husband that night again; he came home to my room; we stayed together that night. The next morning we got up and I gave him my meal ticket and he got his breakfast at the boarding-house. He came back and says, 'I have got to have some money,' and I told him I did not have any; he says, 'I will be back this afternoon and you have got to have the money or some thing will be done.' I went to his room in the afternoon to look for him to help him pack his trunk, as he requested, but he was not there. I went then and secured a revolver, as I knew there would be trouble. My life was in danger and I wanted something to protect myself. He had always carried a revolver and told me this revolver had a record of two marks and the third mark will be your mark. His revolver was then in the pawn shop. After I got the revolver I came back home. I went up-stairs and was not up-stairs more than a few minutes when Cummings came in. He came in cursing and calling me all kinds of names; I asked him for my keys; he took a bunch of keys out of his pocket and threw them on the bed and said, 'Here is your God damn keys.' He went around the room cursing and to the corner right in front of the dresser, picked up a pair of scissors on the stand, and he had the scissors like this and was trying to get them open and slung them over in the corner. I was standing at the foot of the bed and the revolver was there on the bed. He said, 'You are a God damn bitch and I am going to finish you right now,' and he put his hand in his pocket and got his knife open and I grabbed the revolver and shot him. I saw the knife in his hand. He said, 'You God damn bitch, I am going to kill you right now.' I was standing at the foot of the bed and he turned around and pulled that open knife from his pocket and I grabbed the revolver and shot him. He was very close to me. I held the revolver right up against his face. I was almost paralyzed for a few minutes and when I recovered I walked down stairs and called Mrs.

Duff and told her what happened. I said, 'Mrs. Duff I shot my husband; it was my life or his, and I had to. I swear I had to save my own life.' Mrs. Duff sent for the doctor right away and I walked upstairs to the second floor and waited for the doctor to come, and I says, 'Here is the man, here is the revolver, here is the scissors,' and I asked him what I should do. He says, 'I will tell you what to do, go down stairs and give yourself up,' and I came right down to the Four Courts and gave myself up. I stopped at my boarding-house and got a cup of tea. When I left the boarding-house I walked to 28th and Olive and took a street car right to Olive street and Eighteenth and transferred to Eighteenth and came here to the Four Courts and I walked to the Four Courts. I walked in there and went up to the railing and asked for the sergeant or captain. I told him my name was Mrs. Cummings and that I had shot my husband in self-defense. He took down my name and called Mr. Harrington who was standing near the railing and he took me upstairs to the matron on the third story.''

At the close of the evidence, the court fully and fairly instructed the jury upon murder of the second degree, self-defense, and reasonable doubt, and the cause was submitted to the jury and they returned a verdict of guilty, assessing defendant's punishment at ten years imprisonment in the penitentiary. From a judgment rendered in accordance with this verdict, defendant in due time and form appealed, and the record is now before us for consideration.

### OPINION.

Numerous errors are assigned and urged by counsel for appellant, as reasons for the reversal of the judgment in this cause.

We will treat the assignment of errors in the order as stated in the brief and give them such consideration as their importance merit and demand.

Appellant complains at the action of the court in its denial of her application for a continuance.

The consideration of the action of the trial court upon the application for continuance leads us to the inquiry as to what are the essential requisites of such application in a criminal case.

In order to conform to the requirements of the statute, upon this subject, it is necessary that the application should show the materiality of the evidence of the absent witness. That due diligence has been used to procure the attendance of such witness. It should substantially state the facts that the applicant expects to prove by such absent witness, and that the applicant believes such facts to be true; it should give the names of the witnesses, and, if known, where they reside or may be found. It should indicate in some way the probability of procuring the attendance of such absent witness or his deposition in the event of the granting of the continuance. It should state that the applicant is unable to prove the facts that are alleged can be proven by the absent witness, by any other witness, whose testimony can be as readily procured. Finally, it should state that the witness is not absent by the consent, connivance or procurement of the applicant, and that the application is not made for vexation or delay, but to obtain substantial justice. The sufficiency of this application must be measured by the essential, necessary requisites above indicated.

A defendant being confronted with a serious criminal charge must exercise reasonable diligence in preparation for trial, and, ordinarily, where he or she in good faith is preparing for trial, and in fact wants the case tried on the day it is set for trial, the application for process for witnesses, who are material to the defendant, is made within a reasonable time before the case is set down for hearing, and is not delayed to a very few days before such hearing.

Application for process for witnesses must be

timely and, if otherwise, upon request for a continuance on the ground of the absence of such witnesses, the trial court will expect and has the right to require a showing of substantial and valid reasons for such failure and delay, in making application for the process.

As applicable to the diligence disclosed in the application for continuance now under consideration, we find the witnesses sought by the defendant to be residents of the city of St. Louis; whether their residence was only temporary or permanent is not disclosed in the application; the case was set for hearing on the 7th of July, process was not procured until the 1st of July.

There is no statement in the application assigning any reasons why the securing of process for these witnesses was delayed until five or six days before the case was to be called for trial.

It is nowhere made to appear by the application when knowledge came to the defendant that the absent witnesses would testify to the facts alleged, to the end that the court might take that fact into consideration in the exercise of its discretion in granting a continuance. If the defendant knew that these witnesses would testify to the facts indicated, and they were located in St. Louis, we see no good reason for waiting to procure process for them until a few days before the case is set for trial, and thereby take the risk of their being absent from the city.

Added to this, it will also be noticed that the residence of witness Miller, or where he could probably be found, is not stated, and the application makes no indication as to the probability of securing the testimony of the absent witnesses or in what time such testimony could be procured, in the event of granting her request for a continuance. The application failed in important particulars to conform to the requirements of the statute.

Granting continuances must rest largely in the dis-

cretion of the trial courts, who are in a much better position to judge of their merits than this court can possibly be; hence, the well-settled rule uniformly adhered to by this court, that unless it is clearly obvious that this discretion has been abused, this court will not disturb the action of the trial court upon such applications. [State v. Banks, 118 Mo. 117; State v. Riney, 137 Mo. 102.]

Numerous complaints are urged upon the action of the trial court in the admission of testimony at the trial.

It is insisted that the court erred in the admission of the testimony of witness Charles F. Krone, for the reason it is argued that his testimony disclosed confidential communications between attorney and client.

An examination of the record before us discloses that no such relation existed between the witness and defendant. Krone was the attorney for her husband upon a charge of larceny, in which case the defendant was the prosecuting witness, and the conversation testified to by the attorney, as occurring in his office, was by no means confidential; in fact, he in no way was the representative of defendant in a professional capacity. We have carefully considered the examination of this witness, and the testimony detailed by him, and find no error in the admission of his testimony.

There were some objections urged to the testimony of Dr. Runge, who was connected with the asylum in which deceased had been employed. The only objections disclosed by the record to Dr. Runge's testimony were directed to his statements that "he had heard of the defendant and that he had requested the deceased to resign his position at the asylum." While it may be said that these statements by the doctor had little or nothing to do with this case, we are unable to see how they could have possibly operated to the prejudice of the defendant in the trial of this cause; there being no other objections to the doctor's testimony, this error

complained of must be ruled adversely to the appellant.

Again, it is insisted that the trial court committed error in the admission of certain testimony by witness E. D. Lingo, who was a police officer. We have patiently and carefully examined the record upon this assignment of error, and can only find two or three objections urged to the testimony of this witness, and they were without merit. First, objection was simply as to a preliminary inquiry as to the business in which deceased was engaged at the time the witness first knew him, and the character and nature of the stand or place of business. It may be conceded that this was immaterial, but it must be remembered, that under the well-settled law of this State, it is not every immaterial and irrelevant matter which may happen to be injected into a case during the progress of a long and tedious trial, that will constitute reversible error; it must be, at least, of such a character as would tend to endanger a fair and impartial trial, before this court would be warranted in reversing the judgment on that ground.

The other objections were in relation to the examination of this witness, as to the identity of a letter addressed to the deceased, and the objections were properly overruled. The witness did not undertake to relate any conversation between the deceased and himself, in respect to this letter; but the witness saw the letter, and how it was addressed, and the questions propounded were simply those tending to obtain from the witness his knowledge as to whether or not the letter shown to the witness in court was the same letter he saw in possession of the deceased prior to his being killed.

It is earnestly insisted that the testimony of A. F. Edmonston, who was a reporter on the St. Louis Star, was improperly admitted. In the statement of this case we have briefly stated the testimony of this witness, and there is no necessity for its repetition here; it is

sufficient to say that we have read in detail the testimony of this witness, as disclosed in the record, and have reached the conclusion that there was no error in its admission. It was simply the reception in evidence of a conversation by a witness with the defendant a short time before the homicide, which indicated the relations existing between the defendant and the deceased, and, in addition, declarations of the defendant in the nature of a threat to make the deceased suffer for what had been published in the paper by the reporter and for what he had told the reporter in respect to the defendant's killing her first husband. This testimony was competent, and there was no error in admitting it.

Complaint is also made in the brief of counsel in respect to the testimony of witness Tony Leissmeister, notwithstanding the record discloses that not a single objection was made to his testimony. It is too late now for the first time in the appellate court to urge objections to testimony of witnesses offered upon the trial. We are not exercising original jurisdiction of this cause, but simply reviewing the action of the trial court upon errors assigned which have been properly preserved in the record before us.

It is earnestly complained that references to defendant's former husband by witnesses Krone and Morgan were incompetent, erroneously admitted, and prejudicial to the rights of the defendant. An examination of the record again discloses that no proper objections or exceptions at the time were preserved to such alleged error.

Again, it is insisted that certain statements made by the circuit attorney in his closing remarks were improper and constitute error. The testimony referred to by the prosecuting officer in his closing address was given by Krone and other witnesses, without any objection or protest on the part of counsel for appellant during the progress of the trial, nor was there any subsequent effort to have it stricken out; hence we feel

that a reference to any part of the testimony of the prosecuting attorney, which was admitted without objection, does not constitute error. The only objections disclosed by the record to the testimony of Krone, upon whose testimony the State's counsel based the remarks to which counsel for appellant now urge objections, was that the conversation between defendant and witness Krone were incompetent on the ground that the witness was acting as counsel for the defendant and could not divulge the communications, and that the questions were leading and suggestive.

There was one other objection to the testimony of witness Krone, directed to any conversation not in the presence of the defendant; this, however, need not be considered, for it is apparent that the entire conversation detailed was between witness and defendant, and the defendant and deceased, when all of them were present.

We are simply confronted with this proposition, Can appellant, during the progress of the trial, permit testimony to be introduced without objection, and then complain that the prosecuting attorney improperly based remarks upon it? The proper and only time to make the test, as to the admissibility of testimony, is at the time it is offered. We are unwilling to sanction the practice, conceding that incompetent evidence was introduced, of allowing the testimony to go to the jury, and wait until counsel in his closing argument proceeds to comment upon it, before interposing objections to it. This is practially this question, for the reference in the conversations, to the killing of her former husband, to which the prosecuting attorney referred in his closing address, went to the jury without objection and exception.

There is no merit in the complaint urged by counsel as to the use of the diagrams of the premises and room where the killing occurred. At the time the diagram was made, the room, together with its furnish-

ings, were in about the same condition as when the homicide occurred, and it is but common practice to use such diagrams in trials of this character, to the end that the triers of the facts may be put in full possession of the full surroundings at the time of the tragedy.

As to the affidavits in support of the motion for new trial, the record discloses that the court gave a reasonable time in which to prepare and file the affidavits, afterwards extended the time for such filing, still we find that they were not filed for at least two weeks after the expiration of such extended time. The trial court was warranted in refusing to consider them; but aside from that, they absolutely failed in many particulars to comply with the essential requisities of application for new trials, upon the ground of newly-discovered evidence. That was the only ground for which they could be legally considered, for the application for a continuance had previously been adjudged insufficient, and the correctness or incorrectness of the action of the trial court upon that application can only be determined from the application at the time it is presented, and its allegations cannot be re-enforced by affidavits filed subsequent to the trial of the cause.

Finally, it is insisted that the trial court committed error in its failure to instruct the jury upon murder of the first degree. This would not constitute error even if there was a charge of that nature upon which to base it; but the record settles this question; the indictment in this cause, as shown by the record, only charges defendant with murder of the second degree.

The former Attorney-General, who briefed this case, as well as the counsel for appellant, doubtless failed to observed the omission in the indictment of the charge of deliberation, which is an essential element in murder of the first degree.

As to the testimony in this case, it is sufficient to say that there was no eye-witness to this homicide, except the defendant; of course, if her version of what oc-

curred at the time of the killing was true, and the jury believed her testimony, then she should have been acquitted; but, under the law of this State, the jury are the sole and exclusive judges of the credibility of the witnesses and the weight to be attached to their testimony; it was for them to pass upon her testimony, in connection with the other facts and circumstances in evidence; they heard her testify, doubtless observed her conduct and demeanor on the stand; they could believe or disbelieve any of her statements. That Dennis Cummings was killed and that defendant killed him, there is no dispute. The jury heard all of the testimony; it was specially their province to consider it and weigh it; they returned a verdict of guilty as herein indicated, and we are unwilling to say that there was not substantial support in the evidence for such verdict.

We have thus reviewed the record in this cause, as it is presented; there are no objections to any of the instructions of the court given at the trial; in fact, this record indicates a trial with a view that no objections or exceptions were necessary. That may be true, if the rulings of the lower court upon questions are concededly correct; but it must not be forgotten that such concession cannot, subsequent to the trial and for the first time, in the appellate court, be withdrawn. This court will only review such errors of the trial court as were timely and properly preserved by the record before us.

We find no errors, upon the record presented, which warrant the disturbance of this judgment. It is ordered affirmed.

All concur.