## THE STATE v. IDA M. KELLER, Appellant.

**Division Two, February 23, 1915.**

1. **CHANGE OF VENUE: Refusal to Hear Witnesses: Untimely Notice.** The statute requires that a reasonable previous notice of an application for a change of venue on account of the prejudice of the inhabitants of the county shall be given to the prosecuting attorney; and the reason for the requirement for notice is that the prosecuting attorney may have time in which to procure witnesses in rebuttal of the evidence offered by defendant in proof of the allegation of prejudice. A notice given five minutes before the case is called for trial, and after the case has been specially set and one hundred veniremen are in court ready for examination, in the absence of any good and sufficient reason for not giving it earlier, is not a "reasonable previous notice," and the court does not err in refusing to hear evidence in support of the application.

2. **JURORS: Disqualified: Not on Panel of Twelve.** Defendant in a murder case is entitled to a panel of forty qualified jurors; and if those peremptorily challenged, whether by defendant or the State, were disqualified and were retained on the panel of forty, even though they were not of the trial twelve, defendant is entitled to a new trial.

3. ————: **Challenge.** A general challenge to jurors, such as, "They are all disqualified," "Defendant objects to juror Hol-

comb," "I think that he is disqualified under the rule and ask that he be excluded," or, "We make the challenge that he is disqualified," is not sufficient.

4. **CONFESSION: Voluntary: To Detective: Extending to Other Officers.** A confession orally made to a private detective by defendant, and later repeated to the sheriff, his deputy, his daughter and the detective and by them reduced to writing and signed by defendant, if not voluntary as to the detective, is not admissible at all, where the written statement made to the sheriff and his party is closely connected with the prior oral one to the detective.

5. ————: ————: **To Private Detective: It Will Be Better For You.** A confession induced by a sheriff or other person in authority by the use of such words as "tell the truth and it will be better for you" is not voluntary; but a private detective is not a "person in authority," and, though he tells a defendant who does not know the difference between a private detective and an officer that he is a detective, and that he is satisfied she murdered her husband and little girl and that "the best thing for you to do is to tell the truth; you will feel better; you will get off better by telling the truth," yet if at the time defendant, though being watched, was not under arrest and no warrant for her arrest had been issued, and she appreciated the detective's lack of official power by asking him if he would tell it if she told him who killed her husband, a confession by her to him is admissible; and will not be held to be prejudicial, where the trial court submitted to the jury the issue of whether the confession was voluntary, by the fullest and most carefully drawn instructions.

6. **MOTIVE: Remote Threats and Ill Will Between Husband and Wife.** Testimony that in former years the defendant, charged with the murder of her husband, had accused him of trying to poison her, that she was greatly angered because he was not willing to sell her property in which they resided, and of other acts of ill-will, unless continuing down to the date of the homicide, should not be admitted as evidence of motive, where after such threats or expressions of animosity were made they lived in apparent amity, but if continuing down to the homicide, they are not because of remoteness inadmissible.

7. ————: **Sale of Wife's Land: Instruction.** Where in the trial of a wife charged with killing her husband, testimony, as proof of motive, is offered that he steadfastly refused to sign a deed to her town property which she had agreed to sell, whereat she became very angry, an instruction telling the jury that she had the legal right to sell and convey the property without the consent of her husband and without his signing the deed, was properly refused, because a comment on the evidence and erroneous.

Appeal from Cass Circuit Court.—*Hon. Andrew A. Whitsitt,* Judge.

AFFIRMED.

*D. C. Barnett, Charles. W. Sloan* and *Allen B. Glenn* for appellant.

(1) The court erred in refusing to consider the application of defendant for a change of venue. The application was in due form as required by statutes. Previous notice had been given to the prosecuting attorney before the trial was commenced and before either party had been called on to announce whether ready for trial or not. Kelley, Criminal Practice (3 Ed.), sec. 321; Secs. 5176, 5179, 5180, 5183, R. S. 1909; Reed v. State, 11 Mo. 380; State v. Lehman, 182 Mo. 443; Corpenny v. Sedalia, 57 Mo. 88; Douglass v. White, 134 Mo. 228. (2) The following named jurors, to-wit: H. M. Halcomb, A. S. Gentry, E. E. Coleman, A. J. Patterson, T. F. Phillips and W. F. Hodkins being of the forty selected, were accepted by the court as qualified against the objections of the. defendant, on the grounds that they had formed an opinion as to the guilt of the defendant which it would take positive evidence to remove. Sec. 5220, R. S. 1909; State v. Brooks, 92 Mo. 542; State v. Culler, 82 Mo. 623; State v. Robinson, 117 Mo. 649; State v. Pushon, 133 Mo. 44; State v. Taylor, 134 Mo. 109. The fact that a juror may have read in a newspaper what purported to be a confession of guilt on part of defendant would be well calculated to make an impression prejudicial to defendant—one hard to remove even by evidence. (3) The court erred in admitting the written confession of defendant for the reason that defendant promptly repudiated the same after learning the full nature of it, and because said confession was obtained by the detective, witness Harry Arthur, through duress and in-

timidation, so that the same was not the voluntary act of said defendant. State v. Young, 119 Mo. 495; State v. Naughton, 221 Mo. 398; State v. Lehman, 175 Mo. 619; State v. Thornton, 245 Mo. 440; State v. Thomas, 250 Mo. 189; Couselman v. Hitchcock, 124 U. S. 547; Ammons v. State, 18 L. R. A. (N. S.) 768, 80 Miss. 592. The circumstances detailed by defendant and not contradicted showing that she was summoned before the coroner's jury, and the ordeal through which she passed under the investigation and probing by the detective Arthur who admits in his evidence that he had at the time a pistol on his person showed defendant's confession was not voluntary. See cases last cited. (4) The court erred in excluding the testimony of witness D. C. Barnett to show that he had been unable to get defendant's little boy to talk with him at all; when it was already in evidence on the part of witness Arthur, detective, as to a conversation he had with the little boy. (5) The State having introduced evidence tending to show some disagreement between the defendant and her deceased husband about selling or trading the property where they lived, and it appearing from the evidence that the title to said property was in fact the separate property of defendant, the court erred in refusing to give instruction number one asked on behalf of defendant to the effect that the defendant had the legal right to sell and convey said property without the consent of her husband, and without his signing the deed if she saw proper. Bank v. Hageluken, 165 Mo. 443.

*John T. Barker,* Attorney-General, and *Thomas J. Higgs,* Assistant Attorney-General, for the State.

(1) The requirement of the statute that reasonable previous notice must be given is not to be held meaningless. It was never contemplated that the stat-

ute should be used as an instrument for delay and appellate courts are not required to close their eyes to the disclosures of the record. State v. Bletz, 171 Mo. 537; State v. Davis, 203 Mo. 621. The ruling of the trial court as to the granting of a change of venue will not be disturbed unless there are circumstances of such a nature as to indicate an abuse of the discretion lodged in such court. Only when the trial court so far palpably violates the discretion lodged in him as to preclude the defendant from having an impartial trial will the appellate court intervene. State v. Shaffer, 253 Mo. 334; State v. Anderson, 252 Mo. 101; State v. Barrington, 198 Mo. 23; State v. McCarver, 194 Mo. 717; State v. Rasco, 239 Mo. 535; State v. Sharp, 233 Mo. 283. (2) Where a juror on his *voir dire* examination declares that his opinion is not such as to bias or prejudice his mind, and that his opinion will readily yield to the evidence in the case, he is a competent juror. State v. Schumeback, 243 Mo. 538; State v. Church, 199 Mo. 629; State v. Darling, 199 Mo. 188; State v. Sykes, 191 Mo. 75; State v. Brennan, 164 Mo. 507; State v. Bronstine, 147 Mo. 520; State v. McGinnis, 158 Mo. 105. The ground upon which a juror is challenged must be stated. Simply objecting to a juror as being disqualified is not sufficient. State v. Bobbitt, 215 Mo. 44; State v. Taylor, 134 Mo. 142; State v. Reed, 137 Mo. 132; State v. McGinnis, 158 Mo. 118; State v. Evans, 161 Mo. 108; State v. Myers, 198 Mo. 247; State v. Depley, 242 Mo. 474. (3) A statement to the accused by the person having him in charge to the effect that it will be better for him to tell the truth about the matter, will not annul the confession. Hawkins v. State, 7 Mo. 190; State v. Patterson, 73 Mo. 695; State v. White, 17 Kan. 221; State v. Anderson, 96 Mo. 24. The fact that the defendant is in charge of an officer is no objection to a confession, if no threats were made and no promises were given defendant. State v. Wooley, 215 Mo. 683; State v. Simon, 50 Mo. 370; State

v. Carlisle, 57 Mo. 102; State v. Shackleford, 148 Mo. 493; State v. Vaughn, 152 Mo. 73; State v. Barrington, 198 Mo. 23; State v. Armstrong, 203 Mo. 554; State v. Stebbins, 188 Mo. 387; State v. Church, 199 Mo. 205; State v. Brooks, 220 Mo. 74; State v. Wilson, 223 Mo. 173; State v. Green, 220 Mo. 642. Confessions, elicited by questions put to a prisoner by an officer or by a private person, are admissible in evidence against the prisoner. State v. Stebbins, 188 Mo. 387; State v. Barrington, 198 Mo. 23; State v. Curtis, 97 Mass. 578; Rex v. Unchurch, 1 Moody C. C. 465; Rex v. Wild, 1 Moody C. C. 452; Rex v. Thornton, 1 Moody C. C. 27. It is no objection that the confession is made in response to questions which assume the guilt of defendant. State v. Barrington, 198 Mo. 23; Rex v. Thornton, 1 Moody C. C. 27. In the absence of actual promises or threats, mere threatening circumstances will not exclude the confession. State v. Armstrong, 167 Mo. 257; Rice v. State, 47 Ala. 38; State v. Ingram, 16 Kan. 14. The presumption is that confessions have been freely made until the contrary appears. State v. Armstrong, 203 Mo. 559; State v. Meyers, 99 Mo. 119; People v. Barker, 60 Mich. 295; Com. v. Culver, 126 Mass. 464; 1 Chitty's Crim. Law, 571.

FARIS, P. J.—Defendant, prosecuted in Cass county upon an information charging her with murder in the first degree, for that, as it was alleged, she had killed her husband, was convicted and her punishment fixed by the jury at imprisonment in the penitentiary for the term of her natural life. After a futile motion for a new trial, she has appealed.

The record is voluminous, but the salient facts and the facts which we think sufficiently make clear the points which it has become necessary for us to discuss, are substantially as follows:

Arthur Keller, the deceased, for whose murder defendant was here prosecuted, was the husband of

defendant and lived with her and the three children born. of the marriage in Harrisonville in said Cass county. Deceased was a laborer, employed as a section hand on the railroad. The house in which deceased and defendant lived belonged to the latter; she was desirous of selling or trading it for farm land in order that she might move to the country. The deceased was opposed to selling or trading the property, and his reluctance in this behalf had, it seems, already caused the falling through of one or more contemplated trades therefor that defendant had arranged. For this reason and on account of other family jars these spouses had not gotten along very well together for some several years. The exact date at which trouble began is a little obscure from the record, but the testimony takes it back either to 1910 or 1911 (the witnesses themselves did not definitely recall the year), and these strained relations continued down to the date at which Arthur Keller was murdered. The proof of the crime consisted largely of a confession, of which more anon, and of circumstantial evidence, and so much is said above as to strained relations because motive was sought to be eked out therefrom.

In the night following June 9, 1913, at about the hour of 1:20 in the morning, one Bagshaw, a neighbor of the Kellers, was awakened by someone tapping on the window and calling his name. He got up, opened the door and saw defendant on the porch. She told him that some unknown person had broken into her house and murdered her husband and her little girl Margaret. She had in her hands at the time an axe and a lantern. She asked Bagshaw to call Dr. Overholzer, a physician; but upon Bagshaw's inquiring of her the telephone number of the physician, she replied she would call him herself and thereupon did so. She then picked up the lantern and the axe and went back home, and was followed there some ten minutes

263Mo35

thereafter by the witness Bagshaw and one Mrs. Kline, likewise a neighbor. These persons found deceased lying on the bed struggling for breath and found defendant bathing the face of the little girl. Both deceased and the little girl Margaret, who was seven years old, had been struck with an axe and their skulls crushed. Deceased died a little more than an hour thereafter, but the little girl lingered until the following night.

When other neighbors reached the Keller home they found the kitchen door locked and the key thereof among a bunch of other keys sticking in the lock on the outside.

The story first told by the defendant was to the effect that she was asleep in a folding bed with the smaller children while her husband and Margaret were asleep in another bed in another room; that she heard a noise like the slamming of a door and being awakened thereby raised up in bed and saw a man coming from the room in which her husband and Margaret lay with an axe in his hand; that this axe was her husband's, and that the socks which the man had on, he being otherwise barefooted, were those of her husband. She further said that this unknown man came toward her and struck at her with the axe, but missed her and struck a part of the folding bed in which she was lying, breaking off a piece therefrom; that she sat up and grabbed the axe and after a struggle with the man the latter turned the axe loose, leaving it with defendant, and ran, leaving the house by the kitchen door, which he unlocked. Thereupon defendant, according to her first story, got up, lit the lantern, took her revolver out of the drawer where she kept it, and went into the room where her husband was in order to ascertain how badly he was hurt. She found him and Margaret, she says, in the condition we have already noted. After getting some water and giving it to Margaret and after bathing the latter's face she put the

revolver away, got the axe and went to her neighbors to have them call a physician.

There was testimony that defendant had taken out some insurance in her favor on the life of the little girl Margaret, and also some testimony to the effect that she had requested that the fact of her having taken out such insurance be kept secret from deceased. The latter was a member of the Modern Woodmen and held in that society a certificate of insurance for the sum of one thousand dollars. A very few minutes after defendant had called the neighbors and informed them of the attack upon her husband, and while the neighbors were at her home and while her husband was lying wounded and dying, she made inquiry of one Rooks, a witness in the case, as to the condition of deceased's insurance and as to the likelihood of her being able to collect it. Otherwise, throughout the ordeals of the death and burial and inquest upon her husband, she evinced no emotion.

Almost from the beginning the officers and the neighbors seem to have suspected the defendant of the murder of her husband and little daughter. Shortly after the death of her husband a watch was put upon her, though no warrant was obtained for her, nor was she arrested or taken into custody until subsequent to her making the confession below referred to. The officers of the county procured a private detective, one Harry Arthur, to come down from Kansas City and undertake the discovery of the guilty person. Arthur seems to have gotten to Harrisonville on the day following the burial of deceased and while the inquest touching the manner of his death was still proceeding. He examined the premises of defendant and had a conversation with the little five-year old boy of defendant and deceased. In the afternoon of the same day he had a conversation with defendant which lasted some several hours; in the course of which and at the end of which, he obtained a statement from her admit-

ting her guilt. Thereupon he called the sheriff, Jim Prater, the son of the latter, Ben Prater, a deputy sheriff, and one Runnenberger, the coroner of Cass county, and in the presence of these four a confession was made by defendant, which was written down by Ben Prater. After this confession was written the prosecuting attorney, Mr. Haynes, was called in; he read the statement over to her; made inquiry of her as to its truth and as to whether it was voluntary and of her own free will, and she answered that it was. This statement was then signed by her and witnessed by the detective Arthur, the coroner Runnenberger, and by Jim Prater and Ben Prater, sheriff and deputy sheriff, respectively. Omitting signatures of defendant and the above named witnesses, it is as follows:

"My name is Ida Keller. I am thirty years old. I live at Pleasant Hill Road and Mo. Pac. Tracks here in Harrisonville. On Monday night, June 9th, I went to bed about 8 p. m. with my two smallest children after putting my little girl Margaret to bed in north room; my husband Arthur Keller, was sitting in the kitchen reading. I was feeling awfully tired, and had an awful hurting in my head. I have had this hurting in my head the last two years. Two years ago I was tearing down a hen house and the roof fell on my head and knocked me down and I did not know anything for a half hour. After going to bed Monday night, June 9th, I laid there for some time, I don't know how long. I did not know anything from the time I went to bed with my clothes on about 8 p. m. until about 1 a. m., next morning, when I was in the kitchen getting a lantern to go to Margaret and Arthur. I knew I had done something awful wrong, and went to get the lantern to see what I did if I had been in my right mind. After thinking a few minutes I remember being in the room before I went to get the lantern, and Arthur and Margaret were both asleep. I remember striking them both with the axe but don't know which I struck first,

but I think I struck Arthur first. The blind was up and I could see them both laying on the bed, and there was no light in the room at that time. After striking them I stood the axe in the corner by the dresser and it was then that I went into the kitchen to get the lantern. I don't know what made me lose my mind, I don't see why in the world everything came out that way. I would not have killed them if I had known what I was doing. This was about 12:45 as it was 1 o'clock when I got back from Mrs. Kline where I had gone to call the doctor. I know this because I looked at the alarm clock that was sitting on the chair by Arthur's head, as soon as I returned from Mrs. Kline. Before going to get the lantern and immediately after striking them I picked up a piece of brown paper sack that was lying on the floor and put it on a chair about three feet from the bed where Arthur and Margaret were lying, and set it afire, it did not give good enough light and it was then that I went in the kitchen and got the lantern. After getting the lantern I took the bucket of water into the room where they were lying and bathed Margaret's face and Arthur's head. As soon as I returned from Mrs. Kline where I had gone to call the doctor and before Mrs. Kline and Clarence Bagshaw could get to my house, I took the axe that I had struck Arthur and Margaret with and struck the head of my own bed, breaking a piece of it off. I done that to leave the impression that some one was striking at me, and I don't see how I come to lose my mind that way. I don't remember how hard I hit them but don't think I hit them my best. I do know that neither of them moved after I struck them. Margaret made a noise as if she was strangling and Arthur made a noise as if he was sleeping hard. I am awfully sorry that this has happened.

"When I was talking to sheriff Prater this morning I told him that I realized now that I had done some things and said some things that night, that I hardly

knew what they were, but I realized today that I was the one that killed Arthur and Margaret, but I didn't know that night what I was doing.

''I make this statement of my own free will because it is true, and without threats or promise of reward.''

Subsequently in the evening of the same day following the making of this confession, defendant reiterated to sheriff Prater and to the daughter of the latter, a Mrs. Nellie Brierly, the fact of her guilt; however, thereafter and during the same night she made denial to the sheriff of all these confessions.

The chief contention in the case revolves about the question whether this confession was made voluntarily by defendant, or she was induced to make it by fear, or by the holding out to her by Arthur of such inducements as rendered it inadmissible. Defendant took the stand upon this question, as likewise upon the merits, and touching the manner in which she was induced to confess stated that Arthur, the detective, flourished a revolver before her face, told her that she was lying and induced her, she supposes, to make the confession to him and to make and sign the one which she made in the presence of the officers named. As to these confessions, however, both the oral one to Arthur and the written one made in the presence of Arthur and the officers, she asserted she had no recollection; that if they were made by her they were made while she was unconscious and out of her mind. All of these statements were absolutely contradicted by Arthur and the other witnesses in the case, except that upon cross-examination Arthur admitted that he had a pistol in his pocket, but denied that he drew it or showed it to the defendant, though he conceded that since he was in his shirt-sleeves she may have seen the pistol in his pocket. Other witnesses in the case corroborated Arthur as to defendant's condition, and testified that she was not unconscious or excited when making the con-

fession, but on the contrary was cool and collected, and in her right mind seemingly.

Other facts are pertinent, but since these can be best and most clearly shown by setting them out in connection with the points raised by defendant and discussed by us, we relegate the reader for these facts to the opinion, wherein will be found all such further facts as may serve to make clear what we have to say.

## OPINION.

I. The defendant insists that the court erred in refusing to hear testimony upon her application for a change of venue based on the ground of the bias and prejudice of the inhabitants of Cass county. Some clarity may be shed upon the law point involved by a brief reference to the facts and the chronology thereof. Defendant was arraigned and entered a plea of not guilty on July 7, 1913; on July 15, by consent of defendant and the State, the case was set down for trial on September 22; later, likewise by consent, the date of trial was changed to September 29; on September 23, on motion of defendant, the sheriff was disqualified and two elisors were appointed, and thereupon a venire for 100 jurors issued, returnable September 29. The application for a change of venue was filed on September 29. The circumstances of the filing thereof, the time of such filing and the time of giving notice of the intention to file same, are shown by the order of the court overruling the application for the change of venue. This order is as follows:

*Change of Venue.*

"Motion for change of venue, filed this day by the defendant for change of venue from this, Cass county, to some other county in this circuit, on account of the bias and prejudice of the inhabitants of this county against the defendant, is seen and read by the court and by the court overruled, on the ground that there was no reasonable previous notice given as copy of said

application was first handed the prosecuting attorney and notice first given five minutes before 10 o'clock a. m., the time for the beginning of the trial of this cause, and after venire has issued and additional number of 100 jurors had been summoned, duly to be present and are present, out of which the jury are to be or may be selected, in addition to the regular panel of about 20 jurors, making in all now waiting and present about 120 men, summoned from the body of the county by the elisors appointed, at request and on application of the defendant, on call of this case Tuesday, September 23, 1913.''

Specifically, this application was overruled because no sufficient prior notice of the presentation thereof had been given to the prosecuting attorney. It does not aid or injure this bald point that defendant asked to be permitted to offer ten witnesses in proof of the prejudice alleged and that the court refused to hear such witnesses, because the notice was untimely. For we must assume that these proffered witnesses would have sworn as defendant stated they would swear when she offered them. Obviously notice given to the prosecuting attorney five minutes before an application for a change of venue is filed, of the intention to file and have the same heard, is not ordinarily timely or reasonable. If then timely or reasonable notice be required, the learned court was right; if it is not so required, he was wrong and the case should be reversed and remanded.

The statute (Sec. 5180, R. S. 1909) provides with reference to applications for changes of venue, among other things not now pertinent, that "reasonable previous notice of such application shall in all cases be given to the prosecuting attorney." Of this statute it was said in State v. Blitz, 171 Mo. l. c. 537, that:

"While the court should treat the subject of notice as contemplated by the statute in these applications with great liberality, to the end that a fair and

impartial trial may be secured, yet the requirement of the statute that reasonable previous notice must be given, is not to be construed as meaningless. As was very appropriately said in case of State v. Reed, 11 Mo. 379, it devolves upon the court to determine the question of reasonable notice from the existing facts surrounding the case at the time the application is presented. The notice in this case was given at five o'clock the day before the case was called for trial, and the question presented is, was the action of the court in overruling the application for change of venue, arbitrary and contrary to the spirit of the statute in the administration of law? To fairly interpret the action of the trial court, we must look to the record as to the existing facts surrounding it, at the time of the action."

The reason lying back of the statutory provision for notice is that the prosecuting attorney may have time in which to procure witnesses in rebuttal of the evidence offered by defendant in proof of the allegations of prejudice. [State v. Blitz, supra.] The statute itself specifically permits such rebuttal when the alleged ground for a change of venue is, as here, the prejudice of the inhabitants of the county. [Sec. 5180, R. S. 1909.]

The case of Reed v. State, 11 Mo. 379, to which defendant calls our attention, in no way militates against the views expressed in State v. Blitz, supra. The Reed case, however, was a case wherein the application was based on the alleged prejudice of the trial judge and not on that of the inhabitants, and furthermore there then existed no statutory provision for the offering of rebuttal testimony (Sec. 20, p. 874, R. S. 1845), though it might well be that such a provision could not have affected and would not have affected the decision in the Reed case. Likewise our attention is called to the case of State v. Lehman, 182 Mo. l. c. 443, where it was said that "this court, if the conditions existed, might

treat a few moments notice before the case is called for trial, as being reasonable, and the action of the court, when a proper showing is made under such circumstances, denying the application, might constitute error.'' This view it is obvious connotes the statute quoted as to reasonable notice, but turns upon the construction of what is reasonable and refers the question of reasonableness to the facts for determination. A short notice might be a reasonable notice under a certain state of facts and a much longer notice not reasonable under other facts. Any other view would be to fly full into the face of the statutory provision quoted. Where the time of notice before the application shows it to be obviously and unreasonably too short, in the light of the statutory provision quoted, it is the duty of defendant to give some good and sufficient reason for not giving notice earlier. This she has not done. On the contrary, her application states generally that ''the said facts'' (presumably of the existence of the prejudice which she alleges, though she does not say so), ''first came to her knowledge since the last preceding continuance of this cause;'' she does not set forth the time specifically at which she learned the fact. We do not say that the allegation of immediate prior discovery of the existence of prejudice would at all times or at any time save an otherwise unreasonably short notice, but we do say that it might well be considered, with all other facts in the case, in determining the reasonableness of the notice. The facts here and the acts of defendant all regarded, we do not think the notice given was reasonable and therefore hold that the trial court did not err in refusing to grant the application for a change of venue. [State v. Burns, 54 Mo. l. c. 281; State v. Caudle, 174 Mo. 388.]

II. Complaint is strenuously made of the action of the court in overruling the challenge for cause of

Jurors:
Challenge.

defendant to six of the panel of forty jurors who qualified. While the whole of these six whom defendant now urges were disqualified for that they had formed opinions, were challenged peremptorily, either by the State or by the defendant, and were not of the trial twelve, this cuts no figure in the law of the case. Defendant was entitled to a panel of forty qualified jurors, from which to make her peremptory challenges.

As to the jurors Patterson, Phillips and Hodkins, defendant made no objection whatever. Her counsel simply remarked: ''They are all disqualified.'' Touching Halcomb counsel for defendant said: ''Defendant objects to juror Halcomb.'' After Gentry was examined counsel impersonally remarked to the court, ''I think he is disqualified under the rule and ask he be excused,'' and as to Coleman counsel for defendant said at the close of his *voir dire* examination: ''We make the challenge that he is disqualified.''

In the case of State v. Taylor, 134 Mo. l. c. 142, the ground of the challenge for cause was: ''Counsel for defendants objected to this juror as disqualified and not qualified to sit as a competent juror in this cause, and challenged said juror for cause.'' There can be of course no two views that the language of counsel in the Taylor case constituted a far stronger objection than any of those made in the instant case. Nevertheless, it was held that such an objection was a mere statement of a legal conclusion and amounted to no more than to say merely, ''I object.'' The Taylor case has been many times cited and quoted with approval on this point (State v. Miles, 199 Mo. 530; State v. McCarver, 194 Mo. l. c. 737; State v. McGinnis, 158 Mo. 105; State v. Evans, 161 Mo. 95; State v. Bobbitt, 215 Mo. l. c. 44), and while the facts here warrant our view that it is not necessary to go so far in this case as the court went in the Taylor case, we yet do

not hesitate to say that the objections in the instant case were not sufficient. We disallow this objection.

III. Whether the confession of defendant was voluntary is the next contention confronting us. This confession was made first to the private de-**Confession.** tective Arthur, then immediately following this to the sheriff Prater and others, and after this to Mrs. Nellie Brierly. If there was such involuntariness in the eliciting of this confession as to make it inadmissible, such condition arises from the acts and statements to defendant of the private detective Arthur, since there is no word of testimony connecting the sheriff or his co-auditors, or Mrs. Brierly, with any inducement or coercion by word or deed. We may concede, however, that the statements of the defendant to the sheriff and his party and to Mrs. Brierly are so closely connected in point of time and circumstance with the confession to Arthur as that if the confession to Arthur was inadmisible, that to the sheriff and to Mrs. Brierly are likewise inadmissible.

The testimony of defendant as to what occurred is not corroborated by any other witness, but on the contrary is, in many respects and as to many statements, absolutely contradicted. The trial court held, as his action indicates and as well he might, that the version of the detective Arthur was the true one. If then we find no reason existing in his testimony for declaring the confession inadmissible, we must hold that the court did not err when he let the confession go to the jury. Turning to the testimony of the witness Arthur he says that in the beginning he informed the defendant that he was a detective and that he had come to Cass county to find out who had murdered Keller and the little girl. Going now to the very strongest statements shown by the record as having been made by Arthur to the defendant and which militate in law against the admissibility of the confession upon the

theory of its being involuntary, we find this detective saying to defendant: " 'I am satisfied you murdered your husband and your little girl and the best thing for you to do is to tell the truth. You will feel better; you have not had a night's rest since this come off, and my experience has shown me that a woman or a man in that condition always feels better after they have told the truth. Tell the truth about it.' I told her that anything she said to me would be used against her, but that if she would tell the truth it would be better for her all the way down the line. 'You will get off better by telling the truth.' " As to a part of this there is some corroboration from the defendant herself; for example, the admits that the witness Arthur told her he was a detective. As to one other fact, viz, that Arthur told her she would feel better when she had told it, and by slight inference that this was the chief inducement moving her to confess, there is some slight corroboration from one Ogilvie, a witness for the State. He says when Arthur left, defendant shook hands with him and said she felt much better since she had told it all.

At the time this confession was made defendant was not under arrest. She was suspected and was being watched, but as one of the witnesses puts it, she was not "formally under arrest." She was free to go and come, but it seems had been requested to come to the office of the prosecuting attorney in order that the detective Arthur might question her.

It is fairly clear by all of the books and cases, if language like that used by the detective Arthur had been used by the sheriff, or the jailer, or the prosecuting attorney, or by any other of those whom the books denominate "persons in authority," the confession here would be utterly inadmissible, because not voluntary. [1 Greenleaf on Ev., sec. 222; 3 Ency. of Ev. 316.] The authorities practically all agree that a confession induced by a "person in authority" by the use

of such words as "tell the truth and it will be better for you," renders the confession inadmissible.   [3 Ency. of Ev. 311; 12 Cyc. 470.]   But the witness Arthur was a private detective; she was not in his custody and the cases say that a private detective is not a "person in authority" within the purview of the rule we quote above.   [3 Ency. of Ev. 319; State v. Patterson, 73 Mo. 695; State v. Jones, 54 Mo. 478; 12 Cyc. 472.] While this may be a case of the hardship of single instances, in that it may well be that the defendant here did not know the difference between a private detective and an officer having power to bind and loose, the necessity for a hard-and-fast rule makes us incline to adhere to *stare decisis,* though logic points somewhat the other way.   Some considerable color, however, is lent to a different view, i. e., that she fully appreciated the detective's lack of official power, by the fact that defendant asked Arthur whether he would tell it, if she told him who killed her husband.   If the doubt whether an illiterate woman was led unwittingly to a confession, should lead us to make a rule which the next case of a seasoned confidence man would make us break, it would not add to the stability of the law, nor the science of jurisprudence.   We adhere to the rule and disallow this contention.   We so hold the more readily, since the learned trial court submitted each of these disputed questions touching the voluntariness of this confession to the triers of fact, upon the fullest and most carefully drawn instructions, and they found against defendant.   [State v. Jones, 171 Mo. 401.]

IV.   Numerous witnesses were called by the State in an effort to show that defendant and her husband got along badly with each other.   The proof adduced to show this took a wide range, and began back in 1910 or 1911.   In substance it was shown that defend-

Motive.
ant had charged her husband with trying to poison her; that she kept unknown to

him a revolver to protect herself against him; that she was greatly angered because deceased was not willing to sell the home in which defendant and deceased resided and which was owned by defendant, and that defendant strenuously objected to deceased's holding membership in a certain secret order. To this sort of evidence defendant objected, for that it was too remote, and now here still complains. ˙

If it had not been connected with the subsequent killing of deceased, that is to say, if these quasi-threats and expressions of anger and animosity material to the proof of motive, had not been brought down to the date of the killing, or to a period quite near it, the objection, we think, *on the facts here,* ought to have been sustained. Ordinarily the remoteness of a threat in a case of homicide does not go to the admissibility thereof, but merely to the weight of it as evidence. [State v. Whitsett, 232 Mo. 511; State v. Kretschmar, 232 Mo. 29.] But where the accused is a spouse of the deceased, and after the threat or expression of animosity, lived for years in apparent amicable relations with the person threatened, it would seem illogical, if not unfair, to admit ancient and remote threats, unless continuing down to the date of the homicide, merely that proof of motive might be made only. Some such thought was in the mind of the learned trial judge, for he overruled the objections conditionally and "for the present" only. In the light of the condition here, that these threats continued down to the homicide, we do not think the evidence of threats and ill-will was inadmissible. [State v. Sloan, 47 Mo. 604; State v. Keene, 50 Mo. 357; State v. Adams, 76 Mo. 355; State v. Grant, 79 Mo. 113; State v. Glahn, 97 Mo. 679; State v. Wright, 141 Mo. 333; State v. Coleman, 186 Mo. 151; State v. Cummings, 189 Mo. 626.]

V. Complaint is made of the refusal to give some thirteen instructions offered by the defendant. Such

of these as were not erroneous otherwise were for the most part either comments on the evidence or had been well and fairly covered by the court in instructions already given by him of his own motion. As a specific example of an instruction asked by defendant and refused by the court, which was both a comment upon the evidence, and erroneous, we append that below, viz.:

**Instructions.**

"The court instructs the jury that the evidence shows in this case that the property constituting the residence and home of defendant and her husband, was on February 8, 1908, conveyed to defendant, and that she had the legal right to sell and convey the same without the consent of her husband and without his signing the deed, if she saw proper."

We are cited in support of defendant's right to have this instruction to the case of Farmers' Bank v. Hageluken, 165 Mo. 443. We are not here called on to pass upon the Hageluken case. The trouble cuts a little deeper in the instant case. If it be the law that a married woman espoused since the passage of the Married Woman's Act of 1889, and seized in fee of lands, may convey the entire fee free of any claim of her husband inchoate, or contingent, without her husband's joining her in some wise in such conveyance (the which the writer reserves the privilege of doubting), this would yet not aid this instruction. For both the defendant and her husband, as likewise all otherwise intending or prospective purchasers, seemingly believed, or comported themselves as though they believed that the refusal of the husband was an insuperable legal bar and acted accordingly. If the land could lawfully have been sold with the shadow of inchoate courtesy upon it, and yet no purchaser could be found to buy it thus, the continuance in life of deceased effectually blocked the deal. "I can call spirits from the vasty deep," said Glendower. "But will they come when you do call for them?" asked Hotspur.

We have gone over this most voluminous record of some seven hundred pages, and have examined the specific errors called to our attention by defendant's learned counsel who defended her with signal ability, as also the record in the case, but neither in the record, nor in alleged errors set forth in defendant's brief, have we found anything which would warrant us in reversing it. Let the case be affirmed.

*Brown* and *Walker, JJ.,* concur.