Judge Ry£,and
delivered the opinion of the court.
The indictment in this caá’é contained two coiints ; the first for burglary and the second for grand larceny. The defendant was found guilty on both counts, and sentenced to imprisonment on the first count ■for ten years, and on the second for five years.
‘On the trial the burglary was proved by R. N. Nesbitt; the person whose house had been robbed. The State also introduced as witnesses S. Micheaux, the officer who arrested the prisoner, and B. Nesbit, a son of the prosecutor. Their testimony was as follows :
“The first time I saw defendant was in Cincinnati, Ohio; went there after him and others; had a warrant; saw young Nesbit (Benjamin) there; found the defendant in jail there. I brought him to St. Louis; found nothing on his person. I know the house that was robbed, and saw it after the entrances had been made in it; a door opened from the side into the base of the building where the vault was; the vault had been cut through; saw an axe and crow bar there; saw some powder; the marks of it where it had been burnt. I have conversed with the prisoner. I told him to tell me all about the matter, as I would say nothing about it. My object in telling him this was not to get the money but to catch the other parties. The prisoner told me he was there on the night of the robbery at the house of Nesbitt & Co.; he told me three ethers that were there; he said he he did not know any of them by *465 name, but from my description of them he said they were the persons; he told me that those I described were the principal actors; that he, defendant, did not go into the house, but stood on the outside and kept a look out; he said he met those men who were with him at the robbery on the river; they induced him to St. Louis. After the money was taken they took it to the northern part of the city and divided it after daylight; "they got through the robbery in the morning before day light; had some difficulty in removing one bag of money; it was divided among them; some of the money was worthless; he said it was his first offence; that he was a pilot on a steam boat.”—Cross examined by defendant.—“This conversation was on board the steam boat in the state room, and shortly ■after leaving Cincinnati, and between that place and Louisville the prisoner was ironed with hobbles by myself.
“I had no conversation with defendant in the jail at Cincinnati, Ohio; young Nesbit and the city marshall went with me to see defendant in the jail there; they left at the same time I did. I had many conversations with defendant on way from Cincinnati; do not recollect that defendant told me the amount of money which he got, but said it was less them what the others had. I promised the defendant that I would not appear against him in court if he would confess and tell me all about the act, as my object was to catch them. I told him that it would be better for him to tell me all about it, and that I would give him my honor as a man that I would not appear against him in court unless compelled to, and that he could give state’s evidence if none of the other boys had confessed it; that they had none done so before I left St. Louis. I told him that if I was called I would object to being sworn, as I would not swear against him. I presented inducements to the prisoner to confess before he told any thing of the facts. I told him in these words, that the better plan for him was to tell me all about it, as I would not appear against him, or words to that effect, as it was my object to catch the other offenders. I am confident that I commenced the conversation about the matter first, and brought out the confessions by inducements held out to him. I told him that he could turn state’s evidence and get clear, if the others had not already told it. He then told me all about it and what he did.”
Ben. Nesbit being sworn, says: “I kno\v the defendant; have seen him before; the first time I saw him was in the jail at Cincinnati, Ohio. I know that the banking house of William Nesbit and Robert N. Nesbit was robbed on the night between the 22d and 23rd Marchlast; the house was situated on the north east corner of Main and Olive streets, in the *466 county of St. Louis, in the State of Missouri. This is the banking-house that was robbed at the time above stated. I was a teller in the banking house, and received and paid out money on the evening prior to the night of the robbery.' I deposited the money and checks^received during the day in the vault, which was situated in the basement of the house. I locked the door of the vault, and no one was in there after I was and before the robbery; when I locked the door of the vault on the evening prior to the robbery it contained between $20,000 and $30,000 in silver, gold, bank notes and checks, as follows: $5,000 in silver, $2,000 in gold, and about $20,000 in bank notes and checks. There were a number of bank notes and coins of the same denomination and description, and of the same value as mentioned in the indictment in this cause. The bank notes and coins were all of the property of Robert and William Nesbit; on the first morning after robbery all this money was gone out of the vault and no money at all could be found, except a few silver dollars which lay scattered over the floor. I saw the banking house next morning; it had been entered through an opening made in the outer wall of the building which let the robbers into the part of the building occupied by the Insurance Company: a door was then forced which led into the portion of the building used by Rob. & Wm. Nesbit as the banking house; the floor was then cut which enabled the robbers to get into the basement story; the back or eastern end of the vault was opened; it was an iron vault surrounded by a brick case laid in mortar. There was a hole cut through the bricks and iron large enough to admit a man; appearances showed that the vault door had been attempted to be forced; a corner of was twisted. Also saw powder there; and saw where the door of the vault was blackened near the key hole, as if they had attempted to blow the lock with powder. I left my coat hanging in the banking house on the evening prior to the robbery; next morning found it in the basement with a sleeve cut off. Shortly after the robbery I went to Cincinnati, Ohio, where I found Connerly in jail; Messrs. Goodman & Co. paid me over about $2,500 as money taken from Connerly. I don’t know of my own knowledge that the money was taken from Connerly. Some of this money which I received from Messrs. Goodman of Cincinnati, (they were the agents of Rob. & Wm. Nesbit in Cincinnati, Ohio,) I knew was in the vault of Rob. & Wm. Nesbit on the evening previous to the night of the robbery. Here are two pieces of South Car. gold, called half eagles, each of the value of about $4 80; also a bank note on the bank of Virginia of the denomination of fifty dollars; also a bank note of Ohio of the denomination of twenty dollars. *467 The two gold coins and bank notes were in the vault of Rob. & Wm. Nesbit on the evening prior to the night of the robbery, and the next time I saw them was when they were paid over to me by Messrs. Goodman of Cincinnati. They also gave me the sleeve of my coat, the body of which was left in the banking house. After I left Cincinnati wbh the money, in company of officer Micheau and defendant, on the boat we conversed frequently; defendant told me that he was present at the banking house of Rob. & Wm. Nesbit at the time it was robbed; that he was in the passage (being the portion of the house leading to the office of Ins. Co.;) staid there about fifteen minutes; he then went out to keep guard; he would give signals when any one approached that those in the house might cease making a noise; they commenced about 10 o’clock and left the banking house just before day light; he helped to carry the money. They took the money to their room on Franklin avenue and divided it; his share $3,000. There were four others engaged with him; the names of the men I did not know; first saw them in the lower Mississippi river, and they prevailed on him to come to St. Louis; he is a steam boat pilot. The rest swindled him a little; a part of the money he got was not good. This conversation was entirely voluntary on the part of the defendant when he and myself were alone. He told me this on the boat several times. I never held out any inducements whatever to get him to tell me any thing about it; he would commence the conversation himself.”
No objections were made to the competency of these witnesses or to the competency of their evidence; but before the case was submitted to the jury, the court was asked to give the following instructions:
“1. If the jury believe from the evidence that the confessions made by defendant, made to the officer and other persons having defendant in custody, were made by inducements held out to the defendant, or promises which operated upon the mind of the defendant in hope of escaping punishment, or any other inducement amounting to threats, fears or promises, and that from such inducements the defendant made his several confessions, they should disregard them.
“2. That before any confession can be received as evidence in a criminal case, it must be shown that it was voluntarily made, and that if the confessions drawn from defendant were by the use of the flattery of hope, or by the torture of fear, or by such promises held out to the defendant that rendered his said confessions involuntary, then the jury should reject such confessions.
“3d. That if the defendant was made to believe that a confession of *468 the whole matter connected with the robbery should not be used to his prejudice in a court of justice, but that the confession would better his prospects for escaping punishment, though it was at the same time told him the object of those getting the confession was to catch other offenders, and not to be used against him, this is such an inducement as should warrant a jury in excluding the evidence in rendering n verdict in the cause.
“5th. That if the confessions made to one of the witnesses was the same as that made to the person who. presented inducements to defendant, and after the first confession made in answer to such inducements,, it should be regarded as the confession made in the first instance.”
These instructions were refused, and the court instructed the jury as. follows :
“If thfe jury believe from the evidence that the defendant, in the county of St. Louis, and within three years before the finding of the indictment, did break into and enter in the night time, or that the defendant did aid and assist any other person or persons, by keeping watch or in any other way, while they did break and enter in the night time the banking house of Wm. Nesbit and Robert Nesbit, in which there was at the time any money kept or deposited, and that the defendant did so break and enter, or assisted any other person or persons in so breaking and entering, for the purpose and with the intent to steal as charged in the indictment, you will find the defendant guilty under the first count in the, indictment.
“If the jury find the defendant guilty as charged in the first count of' the indictment, and also find that the defendant did commit larceny, that is, did steal, take and carry away, or assisted any other person or persons in stealing, taking and carrying away any bank bills, or gold, or. silver coin belonging to William Nesbit and Robert N. Nesbit, as charged in the indictment, for the purpose of converting the same to his own use and profit, and of any valúe whatever, you will find the defendant guilty under the second count of the indictment.
“If the jury find the defendant guilty under the first or second, or. both counts in the indictment, they will assess the punishment by imprisonment in the penitentiary, under the. first count, for a term not less than five nor more than ten years, and under the second count for a term not less than two nor more than five years.
“If the jury find the defendant guilty under one or both counts in the-indictment, they will set forth in their verdict under which of the counts. *469 they find the defendant guilty, and if they find him guilty under both counts they will say so in their verdict.
“To find the defendant guilty it is not necessary for the defendant actually to have broken any part of the house, or actually to have entered the banking house alleged to have been broken a,nd entered; but if the defendant was then and there present, and did any thing towards the completion of the common design to commit the robbery mentioned in said indictment, by watching on the outside of said, house or otherwise, you ought to find him guilty on the first count,
“Voluntary confessions made by the prisoner a?e to be taken against the party making them, for the l,aw presumes that no person will make a confession of crime vfhen there is any probability of escape. But the confession must be made voluntarily: that is, not extorted from the party by force nor induced from him by promises from a person authorised to. hold such inducements. The words that “It is better for you to confess,” or “better for you in the long run to tell the whole truth,” or “better for you to tell all about it, for you can turn state’s evidence,” are not words of sufficient inducement to warrant the jury to disregard confessions made under such circumstances.
“If the jury have a reasonable doubt of the guilt of the accused they must acquit.”
It would have been more regular for the defendant to have made his. objections, to the competency and admissibility of the confession to the court, before the confessions lyere detailed in, the hearing of the jury, and got the judgment of the court on the- confession as to their being proper evidence or not to go before the jury- This course is the safest and best, and is the one required by the practice of the courts and the weight of authority on the subject. It can easily be effected by requiring the jury to be withdrawn to their room under the care of the sheriff, whilst the court is engaged in examining the manner and mode and circumstances under which the confessions were made. The court then declares whether the confessions be such as should be made evidence before the jury; and the defendant has an opportunity of objecting anp excepting to the opinion of the court, and thus saving that point for the supervision of the court.
But in this case this course was not pursued : the defendant brought the competency of the confessions directly before the jury by asking the instructions. The court refused the instructions then asked, and then proceeded to give instructions of its own accord.
We entertain no doubt that, the I0.W is 9,s declared in the defendant’s *470 1, 2, 3 and 5 instructions above set forth ; and had the court in its examination, which ought to have been made into the manner in which these confessions were obtained, been called onto declare the law to be as laid down in these instructions, its refusal to declare it thus would be considered as error. We feel inclined to declare that sucli refusal is still error in the mode pursued by the prisoner’s counsel and the court in relation to the confessions on this trial. We entertain no doubt from the statement of the witness, Micheau, that the confessions were extracted from the prisoner under inducements which are sufficient in law to exclude the idea of such confessions being voluntary. The prisoner was in the custody of the witness: witness had been sent for the prisoner to the State of Ohio: found the prisoner in jail in Cincinnati: witness took prisoner on board a steam boat, put iron hobbles on the prisoner, then commenced the conversation with him by which he extracted the confessions. Witness said to prisoner, “that he would not appear against him in court if he would confess and tell me all about the act;” “it would be better for him to tell me all about it.” “He had better confess and could give state’s evidence, unless some of the others should do so first, and none of them had so done when he left St. Louis.” This testimony should have been excluded from the jury at first; and the jury should have been instructed to disregard it, even after it had been given to them.
We consider the last instruction given by the court to the jury also, as incorrect. For an officer, in whose custody the prisoner is, to say to the prisoner he had better confess, “or better tell me all about it,” “or better plan would be to tell all about it,”'has been uniformly held as sufficient inducement to the prisoner to render any confession, thereupon made inadmissible in evidence. We are compelled in this caseto view the witness, Micheau, in no other light than as an officer. This case is not like the one of “Hawkins vs. The State.” That case was tried before one of the judges of this court when on the circuit bench, and the remark made there to the prisoner by a Mr. King, a private person, the neighbor of the prisoner, and who said to Mrs. Hawkins, the prisoner, “that it would be better in the long run to tell the truth, or tell all about it,” was made sometime before the confession was given by Mrs. Hawkins. She had time to think and reflect; no temporal consideration was offered to the mind.
We do not feel inclined to reverse this case for the court’s refusal to i give the instructions prayed for by the defendant; and if that was the only error we might pass over it. But' as the court undertook to- give *471 instructions of its own accord to the jury, such instructions should have declared the law properly; and we cannot assent to the law as laid down in the last instruction given to the jury by the court.
The judgment of the criminal court is, therefore, reversed ; and this cause is remanded for further proceedings not inconsistent with this opinion.