THE STATE v. MYRON THARP, Appellant.—64 S. W. (2d) 249.

Division Two, October 28, 1933.

*Roy McKittrick,* Attorney-General, and *James L. HornBostel,* Assistant Attorney-General, for respondent.

ELLISON, P. J.—The defendant appeals from a judgment and sentence for robbery with force and arms under Section 4058, Revised Statutes 1929. He was convicted by a jury and his punishment assessed at imprisonment in the State penitentiary for five years. He is twenty-one years old. The specific charge was that he and two other young men of about the same age with a revolver held up and robbed L. V. Smith, a relief station agent of the Quincy, Omaha & Kansas City Railway Company, at the village of Humphreys in Sullivan County, on the night of September 18, 1931, taking from him $43. The three defendants were jointly charged by information. A severance was taken and the instant defendant tried separately. All three defendants testified in this case. Their defense was that while they went through the form of committing a robbery it did not in law amount to that because the affair had been prearranged with and chiefly by Smith in order to get and divide between the four of them a considerable amount of railroad and express money which Smith customarily carried on his person. The defendant has filed no brief. The motion for new trial complains: that there was no substantial evidence to support the verdict; of the instructions given for the State; and of the admission of statements and a confession of the defendant, which it is contended were improperly obtained.

The prosecuting witness, Smith, had been sent by his company to Humphreys on about September 15 to relieve the regular station agent for a few days. He picked up an acquaintance with the defendant Tharp the next day and that night made a trip with him to Trenton, in Grundy County, where there was a street fair or carnival. Two days later on September 18, he says, the defendant proposed that they again go over to Trenton that night. They did, returning to Humphreys about 12:30 A. M. The trip was made in the defendant's car. The latter requested Smith to do the driving

part of the way back. When they got within a mile or so of Humphreys the defendant said he was getting cold and took the wheel. He drove around "the square" once, down by the canning factory and back up to the square where he parked for a few minutes. The two sat in the automobile and talked during that time. The defendant turned off the headlights and then "he reached in and turned the cab light, flashed it on for a second and turned it off again for about five minutes."

The street was dark and up to that time no one was in sight anywhere. Then two men came up suddenly. One flashed a flashlight as he ran toward the car and took a position near the left rear door. The other stood at the front window on the left, or driver's, side and pointed a gun at the defendant and Smith. The window on that side was open. The two robbers wore overalls and had red handkerchiefs tied around their faces and caps pulled low over their eyes. They made the defendant and Smith get out with their hands up. They searched Smith first and took his pocketbook containing $43.50 in currency and silver money, and some railroad passes. Then they searched the defendant and took about $1.45 from him. All this took not over three minutes. The robbers then told them to get in the car and drive off without looking backward. The defendant drove Smith about half a block to the place where he was rooming, let him out, and proceeded on. Smith did not recognize either of the robbers at the time.

The next morning Smith notified the railroad company by wire of the robbery. That afternoon the company sent two special agents named Amis and Cummings to investigate. Smith told them he suspected the defendant of complicity in the robbery though ostensibly he had been one of the victims thereof. The two special agents, learning that the defendant was at Trenton again that evening, drove over there with Smith. After wandering through the crowd on the streets at the carnival they finally encountered the defendant, Tharp, and another man. The special agents took both into custody and conducted them to the police station where they interrogated them separately. The young man picked up with the defendant proved to be Alexander. After the two had been questioned for an hour or more they admitted the robbery and implicated the third young man, McClaskey, or at least the examination by the officers developed enough facts to make them request the sheriff of Sullivan County to come over to Trenton and take the three men into custody.

That same night the party proceeded to Milan, the county seat of Sullivan County, by automobile and the three defendants were put in jail. On the evening of the following day, about 7:30, all three were taken to the office of the prosecuting attorney. There the three defendants made separate written confessions. Those present in the

prosecuting attorney's office at the time were the prosecuting attorney, Mr. A. B. Walker; the prosecuting witness, Smith; Messrs. Amis and Cummings, the railroad special agents; Mr. L. C. Hoover, sheriff of Sullivan County; Mr. A. L. Berry, deputy sheriff. All of these testified the defendant's confession was made freely and voluntarily; that he was not coerced or promised any special indulgence or immunity. On the contrary the State's evidence is that the three boys all were told they might have the advice of counsel if they desired, and that their confessions would be used against them. Two or three of these witnesses for the State said the father of at least one of the boys was present a part of the time during the examination. The confession signed by the defendant, Tharp, was as follows:

"I, Myron Tharp, make this statement freely and voluntarily and having been informed of all my rights and knowing that this statement may be used in court as evidence against me state that on Thursday evening Leamon McClaskey, Russell Alexander and myself got together in Humphreys and planned and arranged to hold up and rob L. V. Smith the station agent at Humphreys, we decided that I was going to go to Trenton with Smith to the Carnival and when we returned I was to drive the car up on the north side of the square at Humphreys and McClaskey and Alexander was to stick us up, and I was to pretend to not know nothing about it. We come back from Trenton that is Mr. Smith and Myself and parked on the north side of the square and waited about fifteen minutes when Alexander and McClaskey come up and Russell Alexander held a gun on us and Lemon McClaskey held a flash light on us, and they Alexander and McClaskey went through our pockets, and then took $1.45 off of me, and about $14.00 from Mr. Smith, in about three or four minutes they let us go and Mr. Smith went to his home and I took the car and went to meet Alexander and McClaskey at McClaskey's home, and then then got in the car with me and we drove on out in the country, and we divided the money and I got $5.00 as my part of the money we got from Mr. Smith, and I also got my $1.45 back that Alexander said McClaskey took off of me. We then went back to town and I stayed all night with Alexander and McClaskey went to his home. I knew that McClaskey and Alexander was going to stick us up before Smith and I went to Trenton as we Alexander, McClaskey and myself planned it. Alexander and McClaskey Had a gun on us when they told us to stick them up and they had handkerchiefs on their faces to disguise them. When we Planned this robbery it was understood that Alexander was to get a gun from his home which belonged to his father.

"Signed this 19th day of Sept. 1931.

"Witnesses:

"A. L. BERRY                  MYRON THARP."

"C. E. AMIS

"G. E. CUMMINS.

When the confession was first offered in evidence the defendant objected on the ground that it had been obtained by coercion and promises of immunity. The court excluded the jury and heard the testimony of the persons present that night, as above named, and they stated the circumstances under which the confession was made, as we have recited them above. The defendant Tharp then took the stand and said after questioning him repeatedly for an hour and a half, Amis promised to turn him, Tharp, loose if he would confess and that he wouldn't have to go to jail. On this preliminary showing, pro and con, the court permitted the confession to be introduced before the jury.

Thereupon all the State's witnesses above named gave their testimony again in the presence of the jury. In the cross-examination of Special Agent Amis during the preliminary hearing on the confession in the absence of the jury, he had been asked if Prosecuting Attorney Walker in his office at Milan told the boys ''it would be better for them if they would come on and tell it.'' Mr. Amis answered in the negative. He was then asked if he, himself, had told the boys that and he answered ''I might have told them at Trenton, but I didn't here.'' When Mr. Amis was examined again on this same matter in the presence of the jury he was reminded of the answer previously given by him and he said what he meant was ''I might have told them at Trenton to tell the truth;'' that he might have answered as the stenographer's notes showed, but the correct answer was as he was then giving it, that he might have told them to tell the truth. The other special agent, Cummins, said he also told the boys the best thing to do was to tell the truth, or to ''come clean and tell the truth,'' or ''to tell it just exactly as it was.''

After the confession was admitted in evidence the defendant Tharp again took the witness stand and testified he signed the confession because of the promises made to him by the railroad special agents. He also said he was told it would be better for him to sign the confession and that the railroad company or express company would make up the lost money if he and his companions admitted the robbery. The two other boys gave testimony to the same effect.

The defendant further swore that the prosecuting witness, Smith, had conceived the idea of staging a fake robbery and had made the suggestion to him, Tharp, two days before while at his home; and that he and Smith arranged the details the afternoon before it occurred. He declared Smith told him he had about $165 of railroad and express money on his person. The defendant's sister testified to having overheard this conversation at Tharp's home. The two other boys, Alexander and McClaskey, said Tharp had told them the robbery was prearranged at Smith's suggestion, and that they engaged in it with that understanding and on the assurance there would be no risk of injury to them.

Under cross-examination McClaskey and Alexander admitted they wore handkerchiefs as masks over their faces; that they made the defendant and Smith get out of the automobile and stand with their hands uplifted while they were being searched; that they took $1.45 from the defendant's pocket in the course of the robbery; that they directed the defendant and Smith to drive away from the scene of the robbery in the automobile: and that the three boys divided between them later that night. in the absence of Smith, the money obtained in the robbery. All three stated the amount obtained was only about $14. of which the defendant got $5, the defendant Alexander $5 and McClaskey $4.50. Also they admitted the $1.45 taken off of the defendant Tharp was returned to him when the division was made. The defendant testified he didn't see any gun used in the robbery. The witnesses Alexander and McClaskey admitted that Alexander used a pistol, but said it was a toy pistol looking like a real one, which formerly had belonged to Alexander's father and later to a child in the family. The defendant and Alexander said only money and no papers were taken out of Smith's pocketbook and that the pocketbook was put back in his hip pocket, where they had found it and where he had said it would be. The witness McClaskey admitted that he and the other two boys after the robbery burned some "papers" they had taken out of Smith's pocketbook but he did not know what had become of the pocketbook.

The three boys explained their failure to say anything in their confessions about Smith's complicity in the alleged robbery by stating it was understood in making their confessions they were to protect him. They also said that although the whole matter was prearranged, they had worn masks, compelled Smith and Tharp to hold up their hands, searched their persons and generally staged the whole thing, because Smith had planned it that way. Their explanation of why they divided all the money taken off of Smith's person between themselves without letting him in on the division, was that Smith had said he would keep his part of the swag and leave their shares in the pocketbook for them to take.

In behalf of defendant there were efforts to show Smith had been keeping company with the defendant's wife, from whom he was separated at the time. There was other testimony that after the robbery Smith made conflicting statements regarding the amount taken from him, sometimes stating it was $50 or $60, and once $47. There was also testimony that Smith had been seen in conversation with the defendant Tharp on the afternoon preceding the robbery and one witness said he saw them together drinking out of a bottle.

[1] ■ The first and second assignments in the motion for new trial are that the verdict is against the law as declared in the instructions given by the court; and that the verdict is against the

evidence and unsupported by substantial evidence. In State v. Francis, 330 Mo. 1205, 1209, 52 S. W. (2d) 552, 554, it was held on authority of earlier cases, that these two assignments are too general and indefinite to comply with the requirements of Section 3735, Revised Statutes 1929. The second assignment, however, does preserve the question as to whether there is any substantial evidence to sup-. port the verdict.

On that question there is no room for doubt. The undisputed, indeed the affirmative, testimony of the defendant and his associates shows a robbery and holdup were committed unless we take as conclusively true their further statement that it was a prearranged affair conceived and consented to by the prosecuting witness Smith. [54 C. J., sec. 45, p. 1025.] Smith swore there was no such conspiracy and that he was put in terror or "scared" by the robbers. The improbabilities and contraditions in the defendants' stories corroborate Smith. Without question there was a case for the jury on these issues.

II. The third assignment is that the giving of four specified numbered instructions by the court at the request of the State was error because said instructions "do not correctly state the law." This assignment specifies nothing—no more than if it had merely stated the broad conclusion that the giving of the instructions was error—and wholly fails to measure up to the requirements of Section 3735, Revised Statutes 1929. It preserves nothing for review.

III. The fourth assignment in the motion is as follows:
"Because an instruction purporting to cover the whole case was in the instructions and purported to tell the jury that defendant was guilty of robbery in the first degree if he committed the assault and the jury so considered it or at least it was among the instructions given to the jury, and it was never given by the court, nor was it so marked. Said instruction is to be found among the instructions and not given a number, nor marked 'given.' "

The gist of the complaint here made seems to be that the instruction was submitted to the jury without having been given by the court. The fact that the instruction was not given apparently is inferred from the fact that it was not numbered or marked "given." It is not contended the instruction was erroneous in form or substance. But the motion for new trial is not verified and does not prove itself. The bill of exceptions brought up by the defendant recites the instruction was given by the court and that the defendant objected and excepted thereto. While it is said to be the better practice to number or letter instructions, or otherwise to give them some identifying mark, State v. Batterson (Mo.), 274 S. W. 43, 46; State v. Harp, 306 Mo. 428, 267 S. W. 845, 847; yet the statute does

not require it, Section 3681, Revised Statutes 1929, and it is not reversible error to fail so to mark them. [16 C. J., Sec. 2472, p. 1034.] It has been held that when a failure to number instructions makes it impossible to tell to what instructions assignments of error are directed, the assignments will be disregarded. Exchange Bank of Novinger v. Turner. 321 Mo. 1104, 1118, 14 S. W. (2d) 425, 429; but this. as we say, does not mean the mere omission to give instructions an identifying mark is of itself cause for reversing a case.

■ IV. The fifth and eighth assignments are that Instruction No. 7 given at the request of the State was bad because it incorrectly stated what facts must be found by the jury to make the defendant liable as a principal: and that it ''charges two offenses in this, to-wit: That an assault was made putting the said L. V. Smith in fear of some immediate injury to his person and by force and violence. which said instructions described two separate and distinct crimes.''

We shall not set out the instruction in full. The parts thereof to which these assignments are directed in substance told the jury if they should find and believe that McClaskey and Alexander, or either of them, made an assault upon the State's witness Smith and took money from the person of Smith against his will, by force and violence to the person of Smith, or by putting Smith in fear of some immediate injury to his person. without any honest claim to the money and with the intent of depriving Smith thereof without his consent; and if the jury further found that the defendant was then and there present, aiding, abetting and encouraging in any way or by any means the commission of such acts, they should find the defendant guilty of robbery in the first degree as charged.

The last part of the instruction is the part made the basis for defendant's assignment that the instruction did not correctly declare what facts should be found by the jury to make the defendant liable as a principal. We see nothing wrong with the instruction. It follows almost literally an instruction given in State v. Affronti, 292 Mo. 53, 70, 238 S. W. 106, 110. It is true that in the Affronti case the court gave a further converse instruction stating the mere presence of a defendant at the commission of a robbery does not of itself render him liable as a participant if he is only a spectator, innocent of any unlawful intent touching the robbery, and does not aid, abet, assist or encourage those who are actors therein. But in the instant case, so far as the record shows, no converse instruction was requested, and it could not have been given if asked, because the defendant and his associates all admitted participation in the robbery. The only defense made was that Smith consented thereto. It is conceded the defendant took Smith to the prearranged scene of the robbery, kept him there until McClaskey and Alexander arrived,

and then went through the form of submitting to the robbers. We can see no merit in defendant's contention on this assignment.

Neither is there merit in the other assignment, which, as we understand it, is that Instruction No. 7 permitted the defendant to be convicted to two distinct and separate crimes: (1) robbery by force and violence; or (2) robbery by putting Smith in fear of immediate personal injury. The information charged the crime in the conjunctive, that is, robbery by force and violence to the person *and* by putting Smith in fear of immediate injury to his person. The instruction permitted the jury to convict if they found the robbery was committed by either of those methods. This was proper, as has been held many times. Indeed, the robbery might be committed both ways at the same time. Force and violence might be used and fear induced thereby. The rule is said to be that from proof of the use of force and violence fear will be presumed. [State v. Lawler, 130 Mo. 366, 370, 32 S. W. 979, 980. See, also, State v. Reich, 293 Mo. 415, 421, 239 S. W. 835, 836; State v. Craft, 299 Mo. 332, 343, 253 S. W. 224, 227.]

V. Finally, the sixth and seventh assignments in the motion for new trial are that the court erred in admitting statements and the confession made by the defendant, because they were induced and obtained by promises of leniency, and that "it would go easier" with him. The law of this State on that point is "that a confession, to be inadmissible must be made to an officer of the law in consequence of improper influences exerted by him, and if no threats of harm or promises of worldly advantage be made by such officer or by the master of the accused when directly concerned, the confession is admissible." [State v. Brooks, 220 Mo. 74, 83, 119 S. W. 353, 356. See, also, State v. Haskins, 327 Mo. 313, 36 S. W. (2d) 909.]

If the case were viewed in the light of the testimony of the three accused boys above we would be compelled to hold the defendant's confession was not voluntary. But the State adduced strong evidence to the contrary, except that this one point arises. The two railroad special agents, Amis and Cummings, admitted that when they interrogated the boys at Trenton almost twenty-four hours before the confession was made and signed by the defendant at Milan, they told them to tell the truth, or that it would be better for them to tell the truth, or that the best thing to do would be to come clean and tell the truth. Was that a promise of "worldly advantage" within the meaning of the Brooks case, supra, or was it a mere adjuration to tell the truth? It is well settled that the latter alone will not vitiate a confession. [State v. Johnson, 316 Mo. 86, 93, 289 S. W. 847, 849.]

In Couley v. State, 12 Mo. 462, 470, it was said "for an officer,

in whose custody the prisoner is, to say to the prisoner he had better confess, 'or better tell me all about it,' 'or better plan would be to tell all about it,' has been uniformly held as sufficient inducement to the prisoner to render any confession, thereupon made inadmissible in evidence.'' In State v. Keller, 263 Mo. 539, 557, 174 S. W. 67, 72, it is said: ''The authorities practically all agree that a confession induced by a 'person in authority' by the use of such words as 'tell the truth, and it will be better for you,' renders the confession inadmissible.'' Other cases more or less in point along the same line are: State v. Brockman, 46 Mo. 566, 569; State v. Powell, 266 Mo. 100, 107, 180 S. W. 851, 852; State v. Hart, 292 Mo. 74, 90, 237 S. W. 473, 478.

On the other hand, in State v. Anderson, 96 Mo. 241, 248, 9 S. W. 636, 638, the defendant was arrested during a coroner's inquest, and taken away by guards while public excitement ran high. They informed him an accomplice had betrayed him and one of them said to him: ''Ed, if you are innocent, stick to it; if guilty, acknowledge it, and it will probably go easier with you.'' The defendant answered if he made a confession it would implicate others and the guard replied, ''That is right; it is right for them to shoulder some of it.'' The guards testified the statements made by the defendant two or three hours later were voluntary and not under the influence of fear. It was held the confession was admissible for the consideration of the jury. In State v. Armstrong, 167 Mo. 257, 66 S. W. 961, it was ruled, as correctly summarized in a headnote to the opinion, that: ''A statement without promise or hope of leniency to the defendant made by the officer in charge of him, even at a time when he was informed that a nearby crowd was probably a mob, that he had better tell the truth about the charge of having ravished a girl, does not make inadmissible the confession then made by the defendant to such officer.'' And in State v. Ball (Mo.), 262 S. W. 1043, 1046, this court declared: ''It cannot be said that there was a threat or the holding of a hope of clemency in the suggestion that the defendant 'had better talk.' '' Other cases apparently leaning to that view are: Hawkins v. State, 7 Mo. 190; State v. Patterson, 73 Mo. 695, 707; State v. McGuire, 327 Mo. 1176, 1184, 39 S. W. (2d) 523, 525.

In the latter case a justice of the peace who had issued the warrant for the arrest of the defendant told him ''all we want is the truth and nothing but the truth,'' and in that connection added, as the opinion states, ''it might make it easier on him if he would tell the truth and nothing but the truth.'' The defendant failed to object to the admission of the confession in evidence on the ground that it was obtained on a promise of clemency. In default of such an objection this court refused to consider the question, but in so ruling used this significant language: ''for the reasons indicated we

deem it unnecessary to decide whether or not under the circumstances shown the statement to the defendant that it might make it easier on him to tell the truth, nothing else appearing, would be sufficient to exclude the confession.''

In other jurisdictions authority on the question is divided, 16 Corpus Juris, section 1476, page 721, with the preponderance apparently on the side that merely telling the accused it would be better to speak the truth does not vitiate the confession. 1 Ruling Case Law, section 102, page 555, says:

''In a number of cases, especially in England, an adjuration or 'exhortation to the accused by a person in authority, as distinguished from a private person, that it would be 'better' for the accused to speak or tell the truth, has been held to render the confession inadmissible. But the sounder rule is that a confession is not rendered involuntary by advice to the accused that it would be better for him to confess or tell the truth or by advice to confess if guilty and if not guilty to stand firm.'' [See, also, 18 L. R. A. (N. S.) 816, note; 50 L. R. A. (N. S.) 1086, note; State v. Jon, 46 Nev. 418, 211 Pac. 676, 30 A. L. R. 1443, 1446.]

The real question is whether the language used in regard to speaking the truth, taken in connection with all the attending circumstances, shows the confession was made under the influence of some threat or promise. [16 C. J., sec. 1476, p. 721.] The accused may act as a matter of independent judgment. A normal, innocent person ordinarily would not accuse himself falsely on a mere adjuration that it would be better to tell the truth. Each case must stand upon its special circumstances—so much so that it has been said to be difficult, if not impossible, to formulate a rule that will comprehend all cases. [Hopt v. Utah, 110 U. S. 574, 583, 48 Sup. Ct. 202, 28 L. Ed. 262.]

While we do not say for a person in authority to tell an accused that it would be better to tell the truth never would invalidate his confession, no matter what the other attendant circumstances might be, yet on both reason and authority it seems clear that such adjuration, with nothing further appearing, would not justify the exclusion of the confession. That is the situation in the instant case and we think the confession was properly admitted, especially in view of the fact that the defendant did not dispute it at the trial, as to its main facts. He simply added more to it by saying the prosecuting witness Smith was a party to the conspiracy.

Another reason why any confession or statements made by the defendant and his accomplices at Trenton to the railroad special agents, Amis and Cummings, were competent is that the latter were mere private detectives and not persons in authority. Cummings was a deputy sheriff of Marion County but he was acting as a railroad special agent at the time and had no authority in Sullivan or

Grundy counties. Being only private detectives admissions made to them would not come under the rule of exclusion discussed in the preceding paragraphs. [State v. Keller, 263 Mo. 1. c. 558, 174 S. W. 1. c. 72.]

Furthermore, whatever may have been the circumstances in which the defendant and his alleged accomplices admitted their guilt to the railroad detectives at Trenton, it was nearly twenty-four hours thereafter when the defendant gave his written confession to the prosecuting attorney at Milan. In the meantime, according to the State's evidence, the three boys had been left to their own devices in the Sullivan County jail. When they were brought to the prosecuting attorney's office they were smoking cigarettes and mentally at ease. The defendant said he wanted to confess and plead guilty at a special term of court. All the witnesses for the State say the defendant was advised he could have counsel and that whatever he said would be used against him. In these circumstances certainly the trial court did not err in leaving it to the jury to say whether the written confession then made was voluntary or not. While it is the rule that where a confession has been obtained under circumstances rendering it involuntary and inadmissible, a strong presumption exists that any subsequent confession arose from a continuance of the same prior improper influences, and while this presumption must be overcome before the subsequent confession can be received in evidence, State v. Nagle, 326 Mo. 661, 673, 32 S. W. (2d) 596, 601; yet we think the proof here was amply sufficient to make it a jury issue whether the confession in the prosecuting attorney's office was voluntary and independent of any alleged influence exerted on the boys in Trenton the preceding evening.

We find no error in the record proper, and the judgment accordingly is affirmed.

All concur.