**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Michael Lee RINEBOLD,
Defendant-Appellant.**

**No. 13814.**

Missouri Court of Appeals,
Southern District,
Division Two.

Dec. 23, 1985.

Motion for Rehearing and Transfer
Denied Jan. 14, 1986.

Application to Transfer Denied
Feb. 18, 1986.

Peter N. Sterling, Public Defender, Rolla, for defendant-appellant.

William L. Webster, Atty. Gen., T. Chad Farris, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

MAUS, Judge.

By Count I, defendant was charged with forcible rape in the course of which he displayed a deadly weapon in a threatening manner. By Count II, he was charged with forcible deviate sexual intercourse during the course of which he displayed a deadly weapon in a threatening manner. A jury found him guilty on each charge. He was sentenced to imprisonment for 30 years upon each count, to run concurrently.

Viewing the evidence favorably to the state as required by the verdict, *State v. Ridinger*, 589 S.W.2d 110 (Mo.App.1979), the following is a summary of the facts. The victim, C.H., is a cousin of the defendant. The defendant had recently been released from the penitentiary. Two days before the occurrence, he spent the night with C.H. and R.H., her husband. On the evening in question, a birthday party for R.H. was held in the mobile home in which he and C.H. lived. That evening C.H. drove to a neighboring community to bring the defendant from his mother's home to the party. The party was also attended by two other couples.

The party commenced about 8:00 p.m. The evening was spent visiting and drinking. At least part of the evening, estimated to be two hours, was spent playing a card game, "red and black." If a player failed to guess the color of the down turned card on the top of the deck, he or she was required to drink a shot. At about midnight, one couple, who lived nearby in a mobile home, left. Those remaining had a steak dinner.

The remaining female guest was going to spend the night with her boyfriend. R.H. and C.H. volunteered to keep her baby for the night. The baby was placed on a pallet in the bedroom of R.H. and C.H., which was in one end of the mobile home. They went to bed. The defendant's bedroom was in the other end of the mobile home. The baby's mother and her boyfriend left, but returned in a short time. The baby cried and awakened C.H. She got the mother to comfort the baby. She went into the living room where she joined the defendant. The mother and her boyfriend soon left. The defendant told C.H. he had a letter he received in the peniten-

tiary which mentioned her. Under the guise of showing her that letter, he lured C.H. into his bedroom. He put a steak knife to her throat and threatened her with death or harm. By fear, she was forced to submit to conventional sexual intercourse and deviate sexual intercourse. C.H. said she bled heavily. The defendant threatened to kill her, her husband and the baby if she told anyone of the incident.

C.H. went into the bathroom to clean herself. She then started cleaning the kitchen. R.H. woke up and came into the kitchen. The defendant was in the living room. R.H. noticed C.H. was nervous. He repeatedly asked her what was wrong, to which she answered, "Nothing." R.H. and C.H. then went back to bed for two or three hours. There was a shotgun in that bedroom. Because of her fear, C.H. made no complaint to her husband. When they got up, they went to the kitchen. The three adults had breakfast. While drinking coffee, R.H. told his wife she would have to take the defendant home. C.H. went next door to her mother-in-law's home to get her sister-in-law to accompany her. The sister-in-law persisted in asking why she had to go along. C.H. then told her sister-in-law and mother-in-law what had happened. The mother-in-law went to the mobile home and got the baby and, on the pretext of needing help, had R.H. come to her home. There he was told of the incident.

The defendant denied the charges. He testified that after the mother of the baby and her boyfriend left, he went to bed. C.H. came into his bedroom. She sat on his bed and they talked. They started kissing and then engaged in consensual sexual intercourse.

After R.H., his mother and the baby left, the defendant went into a field behind the mobile home to check the condition of his mother's car. When R.H. was told his wife had been raped, he ran from his mother's home to find the defendant. His mother sent C.H. to get a neighbor to find the defendant so R.H. wouldn't hurt the defendant.

Evidence concerning the following events was primarily developed upon the suppression hearing. That evidence must be viewed in the light of the findings upon that suppression hearing. Such evidence established that R.H. found the defendant in the field. He hit and kicked the defendant. The defendant said he ran into a woods and hid. He stepped from behind a tree and asked R.H. what was going on. R.H. resumed hitting him and knocked him to the ground. He then kicked him. He had no trouble in subduing the defendant. He told the defendant he ought to kill him.

R.H. had been joined by his step-father. The two of them escorted the defendant back to the neighbor's mobile home. Several people, including C.H., R.H.'s mother and the neighbor, had gathered. R.H. again hit the defendant, threw him to the ground and again kicked him. R.H. told the defendant to apologize to C.H. On his knees, the defendant told C.H. he was sorry he raped her. R.H. also ordered the defendant to tell the officers who were called, "Thank you for arresting me." He did so.

During the episode, R.H.'s mother asked the defendant why he raped his own cousin. The defendant's reply was to the effect, "I don't know, I think I'm sick, I need help." He also asked those present not to call the officers and not to send him to prison. The defendant did not recall saying he was sorry he raped C.H., but might have as he had been hit in the head, was hung over and groggy. The defendant testified when he made those statements he was afraid of being killed or badly beaten.

By an appropriate motion, the defendant sought to suppress the use of any of the statements in evidence. The trial court suppressed the apology and "thanks" to the officers. It found the defendant made those statements under the threat of violence and fear of serious bodily harm. The trial court refused to suppress the statement he didn't know why he raped C.H., he thought he was sick, he needed help. The same is true of the plea not to send him to prison. The distinction was based upon the

fact that R.H. did not order him to make those statements. During the trial, the state, over objection, introduced evidence of those two statements through five witnesses. One witness volunteered testimony that defendant apologized to C.H. for raping her. The trial court refused the defendant's request for a mistrial but instructed the jury to disregard that testimony.

█ The defendant's point on appeal is error in admitting the two statements referred to above because those statements were the result of physical violence exerted by R.H. The defendant cites cases holding the use of involuntary admissions and confessions to be a denial of due process guaranteed by the Fourteenth Amendment. The state first argues the Fourteenth Amendment applies only to state action, not to coercion exerted by R.H., a private citizen. Upon the issue so raised, it is not necessary to consider the question of the admissibility of the statements under the Fifth Amendment as made applicable to the states by the Fourteenth Amendment under *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). The latter question is considered in *Oregon v. Elstad*, — U.S. ——, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

In referring to a confession which is the product of physical force, it has been succinctly said:

> State action enters the picture, however, when a trial court permits the prosecution at a jury trial to utilize as evidence of guilt a confession which is extracted under circumstances that so overbear the individual's will as to render the statement involuntary, that is, 'not the product of a rational intellect and a free will. *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).'

*Hunter v. People*, 655 P.2d 374, 376 (Colo. banc 1982). The first argument of the state has no validity.

The state then cites cases holding the requirements of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) not to be applicable to interrogation by private citizens. E.g., *State v. Brydon*, 626 S.W.2d 443 (Mo.App.1981). It does not cite, as it could, authorities such as *State v. Tharp*, 334 Mo. 46, 64 S.W.2d 249 (1933), in which it was said,

> Another reason why any confession or statements made by the defendant and his accomplices ... to the railroad special agents ... were competent is that the latter were mere private detectives and not persons in authority.... Being only private detectives, admissions made to them would not come under the rule of exclusion discussed in the preceding paragraphs.

*Id.*, 64 S.W.2d at 255. The same is true of *State v. Keller*, 263 Mo. 539, 174 S.W. 67 (1915). It is not necessary to review the latter cases. They deal with promises of leniency and exhortations to tell the truth. They do not involve the use or threatened use of physical violence.

The limitations upon the application of the requirements of *Miranda* are not authority for the state's use of an admission or confession which is involuntary because of the use of or a threat to use physical violence by a private citizen. The fundamental difference between an admission or confession given in violation of *Miranda* and an admission or confession which is the product of actual coercion has been consistently observed. For example, an unwarned admission or confession, inadmissible because of *Miranda*, may be used for impeachment, but an admission or confession, involuntary because of actual coercion, may not. *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *State v. Thomas*, 698 S.W.2d 942 (Mo.App.1985). The requirements of *Miranda* were imposed upon in-custody interrogations to insure observance of the fundamental limitation upon the use of admissions or confessions. *Oregon v. Elstad*, supra.

The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its mak-

er? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

*Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037, 1057–1058 (1961).

■ The parties cite no case dealing with the use of or threat to use physical violence by a private citizen. The authorities are but few. Perhaps this is because the need to observe the fundamental limitation is self-evident. Independent research discloses that it was at an early date, the Supreme Court of Missouri determined that the fundamental limitation was applicable to the use of physical violence by private citizens. In 1829, a trial court was found to have erred in admitting the confession of a slave given after a lashing administered by private citizens. The court observed,

This circumstance might of itself be sufficient to subdue him into any confession required. No doubt when he saw McKinney he hoped for some relief, and asked him for it, but he was told that if he was guilty he should confess, and then was asked if he took the money, to which he replied he had taken it and offered to show where it was. This all might have been done, and most probably was, to gain a respite from pain....

*Hector v. State,* 2 Mo. 166, 168 (1829). This court is not bound by contrary dictum in *State v. Tharp,* supra.

Numerous decisions of this Court have established the standards governing the admissibility of confessions into evidence. If an individual's 'will was overborne' or if his confession was not 'the product of a rational intellect and a free will,' his confession is inadmissible because coerced. These standards are applicable whether a confession is the product of physical intimidation or psychological pressure.... (footnotes omitted).

*Townsend v. Sain,* 372 U.S. 293, 307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770, 782 (1963). The underlying premise of that fundamental limitation demands that an admission or confession, the product of the use of or threat to use physical violence by a private citizen, be excluded from evidence.

■ Contrary to the state's argument, the fact R.H. did not specifically order the defendant to make either of the two statements in question, does not per se establish they were properly received into evidence. The defendant was hit and kicked when he was in the field. He was then forcibly escorted to the assembled group. There he was hit, thrown to the ground and kicked. As ordered, on his knees, he apologized to C.H. for raping her. This was followed by the question by R.H.'s mother which elicited the response, "I don't know, I think I'm sick, I need help."

The decisive question is whether or not that admission, made following his involuntary apology, was the product of a free will. The question is similar to the "fruit of the poisonous tree" doctrine encountered in determining the admissibility of evidence discovered, or a confession given, following an illegal arrest. Compare *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *State v. Johnson,* 530 S.W.2d 690 (Mo. banc 1975); *State v. McMahan,* 583 S.W.2d 540 (Mo.App.1979). The legal parlance usually employed is "it would be most unrealistic and lacking in logic to conclude that any casual connection between the assumed illegality and the confession was not completely attenuated resulting in the confession being an act of free will that completely purged any primary taint." *State v. Reynolds,* 619 S.W.2d 741, 747 (Mo.1981).

In *Oregon v. Elstad,* supra, it has been held:

We must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions

that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waiver or invoke his rights.

Id., 105 S.Ct. at 1296.

However, that decision maintains a distinction in what is required to attenuate a subsequent admission or confession from the taint of a prior admission or confession which is the product of physical violence. "There is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a 'guilty secret' freely given in response to an unwarned but noncoercive question, as in this case." Id. at 1295.

In dealing with an initial confession asserted to be the result of heroin withdrawal, it has been said, "[t]hat the accused has already made an involuntary confession is a strong indication that later statements were not the product of his free will, but it is not dispositive on the issue. The Supreme Court recognized this in *United States v. Bayer*, 331 U.S. 532, 540–41, 67 S.Ct. 1394, 1398, 91 L.Ed. 1654 (1947)." *Holleman v. Duckworth*, 700 F.2d 391, 396 (7th Cir.1983), cert. denied, 464 U.S. 834, 104 S.Ct. 116, 78 L.Ed.2d 116 (1983). In the same vein, the Supreme Court of this state has declared, "the presumption that the subsequent confession is due to the original improper influence is not conclusive. It depends upon the circumstances under which the original confession was obtained and its relation to the subsequent one." *State v. Hart*, 292 Mo. 74, 237 S.W. 473, 478 (1922). Or, put another way, "[t]his court has held that in deciding whether to admit a confession made subsequent to an inadmissible confession, '[t]he appropriate inquiry then becomes whether the conditions that rendered the earlier confessions inadmissible carried over to invalidate the subsequent one.'" *United States v. Ayres*, 725 F.2d 806, 810 (1st Cir.1984), cert. denied, —— U.S. ——, 105 S.Ct. 84, 83 L.Ed.2d 31 (1984).

■ When, under all of the circumstances, the defendant was asked why he raped his cousin, an act for which he had just been forced to apologize, it is difficult to think the defendant could have denied that act. "When the timing and conditions of the confessions are 'so close that one must say the facts of one control the character of the other' the subsequent confession will be suppressed." *Holleman v. Duckworth*, supra, at 396. That is true of the admission, "I don't know, I think I'm sick, I need help." Compare *Brown v. Illinois*, supra; *Beecher v. Alabama*, 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967); *United States v. Lee*, 699 F.2d 466 (9th Cir.1982). *Mincey v. Arizona*, supra, dictates that the convictions must be reversed. The judgment and sentence upon Counts I and upon II are reversed and the cause is remanded for a new trial.

PREWITT, C.J., HOGAN, P.J., and CROW, J., concur.